**NEW ERA PUBLICATIONS INTERNATIONAL, APS, A corporation of Denmark, Plaintiff,**

v.

**HENRY HOLT AND COMPANY, INC., A New York Corporation, Defendant.**

No. 88 Civ. 3126 (PNL).

United States District Court,
S.D. New York.

Aug. 9, 1988.
As Amended Aug. 16, 1988.

Michael Lee Hertzberg, New York City, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D.C. (Michael C. Elmer, of counsel), Lubell and Lubell, New York City (Jonathan Lubell, of counsel), for plaintiff.

Satterlee Stephens Burke & Burke, New York City (Robert M. Callagy, Mark A. Fowler, of counsel), for defendant.

## OPINION AND ORDER

LEVAL, District Judge.

This is an action to enjoin the publication of a critical biography on grounds that the biographer has infringed the copyrights of the subject. The subject of the biography is the deceased L. Ron Hubbard, founder of the Church of Scientology. Plaintiff, New Era Publications International, ApS, a Danish corporation, is related to the Church of Scientology and was founded to hold and exploit Hubbard's copyrights. The author of the biography is Russell Miller. His book is entitled *Bare–Faced Messiah: The True Story of L. Ron Hubbard,* published by Henry Holt & Co., Incorporated, which is the sole defendant in the suit. The au-

thor was not named. The book includes numerous quotations from Hubbard's writings. The defense relies on the doctrine of *fair use,* which permits limited use of copyrighted material for purposes of "criticism, commentary, news reporting, teaching, scholarship or research." 17 U.S.C. § 107. The defendant contends also that even if fair use is not found for all takings of Hubbard's words, the remedy should be limited to damages, rather than an injunction suppressing the distribution of a critical historical study. The action raises issues of significant importance for the writing of history, journalism and criticism, and for the public's opportunity to be informed in matters of public interest.

### Facts

The history of the action is set forth in part in the opinion on the application for a temporary restraining order. *New Era Publications International, ApS v. Henry Holt & Co., Inc.,* 684 F.Supp. 808 (S.D.N.Y. 1988). *Bare–Faced Messiah* has been published in England, Australia, and Canada in substantially similar form to the United States edition. The Church of Scientology sued to enjoin publication in those countries without success.

The first publication was in England in October 1987 after the British courts denied an application for a preliminary injunction. That suit alleged that the book employed confidential church documents, embezzled by a Church employee who had been appointed official biographer of Hubbard and became disaffected. The British courts concluded that the litigation was instituted to "stifle criticism" and not "to protect any legitimate interest of the church in preserving confidentiality." *Church of Scientology v. Russell Miller,* High Ct. of Justice, Ch. Div., Oct. 9, 1987, at 16. The court also found laches, based on the tardy institution of the suit, when the book was already in print. *See Church of Scientology v. Miller & Anor,* Ch. 1986 C. No. 6140, Sup.Ct. of Judic., Oct. 22, 1987, at 10.

On November 19, 1987, New Era commenced action in the Federal Court of Canada alleging that the book infringed the Hubbard copyrights. That court also denied the application for a preliminary injunction on the grounds of laches. *New Era Publications, International ApS v. Key–Porter Books Limited*, No. T–2433–87, Fed.Ct.Can.Trial Div. (Dec. 2, 1987). On December 14, an action to enjoin publication of the book in Australia was withdrawn. By January 1988, *Bare–Faced Messiah* was publicly distributed in England, Canada and Australia.

This action was commenced on May 4, 1988 by application for a temporary restraining order. Two years earlier, the Church had sent Holt letters threatening an action for defamation. During February and March 1988, the Church made overtures to dissuade Holt from publishing the book. When the application for a TRO was heard on May 5, 1988, it came out that a first printing of 12,000 copies had already been substantially distributed and that the second printing was scheduled for the following morning. By reason of laches and consequent financial injury to the defendant, I declined to enjoin the second printing. *See* Order of May 13, 1988. On May 20, 1988, however, after plaintiff agreed to indemnify the defendant in the event of production losses, I granted a TRO restraining distribution of the second printing pending complete submission of proofs. The parties then agreed to bypass the preliminary injunction stage and proceed directly to the submission of an expedited trial seeking a permanent injunction.

There is no dispute that the biography quotes extensively from Hubbard's writings. Plaintiff has submitted a two-column table setting forth (on the left) each passage of *Bare–Faced Messiah* which it contends is an infringement of its copyrights, together with the passage from the copyrighted texts which it contends is infringed. The table consumes 65 pages; the first 22 pages involve quotes from published books; the remaining 43 are quotes and paraphrases of unpublished matter consisting primarily of Hubbard letters and diary entries.

Although plaintiff does not concede justification for the quotations from the previously published works, it no doubt recognizes that defendant's claims of fair use as to those materials are extremely powerful. The dispute focuses rather on Miller's use of extracts from letters and journals that have not been previously published.

Plaintiff contends that the holder of a copyright in unpublished matter enjoys virtually complete protection against claims of fair use. This is to protect the value of the copyright by preserving the copyright holder's control over the first publication of the work. Plaintiff cites recent opinions of the Supreme Court and the Court of Appeals in this Circuit. *See Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); *Salinger v. Random House, Inc.*, 811 F.2d 90 (2d Cir.), *cert. denied*, — U.S. —, 108 S.Ct. 213, 98 L.Ed.2d 177 (1987). Holt acknowledges that the doctrine of fair use has far less application to unpublished material than to previously published work. It argues, however, that plaintiff overstates the rule—that there is a difference between very limited application and none at all. Where the fair use justification is sufficiently powerful to pass an exacting scrutiny, defendant contends that it will permit appropriate quotation from unpublished matter to make an instructive point.

Holt contends there is powerful justification for Miller's quotations from Hubbard's letters and journals. It argues that these are not appropriations of Hubbard's efforts and talents in literary expression, but demonstrations through Hubbard's words of his flaws of character. The thesis of *Bare–Faced Messiah* is that Hubbard was dishonest, pretentious, boastful, paranoid, cowardly, cruel, disloyal, aggressive, bizarre and finally even insane in his pseudoscientific fantasies and his obsessions.[1] Defendant argues that a portrait of these qualities is almost impossible to convey without reliance on the subject's own

---

1. In the Preface, the author quotes a former devotee who sums up Hubbard as "a mixture of Adolf Hitler, Charles Chaplin and Baron Munchhausen ... a con man." (*BFM* 6.)

words, and that the use made of Hubbard's words must be considered fair use even under the restrictive standards of *Nation* and *Salinger*.

Finally Holt argues that, even if it fails to establish fair use as to each of the quotations from Hubbard writings, injunction is not the appropriate remedy. It argues that plaintiff is invoking copyright protection, not in good faith for its intended purpose of protecting the value of publication rights, but rather to suppress a derogatory study of the founder of the Church of Scientology.[2] Defendant contends that First Amendment values are at stake and that, if any remedy is called for, it should be an award of money rather than a prior restraint quashing a critical study of a prominent public figure.

### Discussion

#### I. Fair Use

■ The doctrine of fair use must be understood in the context of the purposes of copyright protection. Article 1, Section 8, clause 8 of the Constitution authorizes the Congress, "To promote the progress of Science and useful Arts by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." The copyright thus is designed to encourage artistic endeavor by securing for the artist or author the commercial benefits of exploitation of his creations. *See Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 429, 104 S.Ct. 774, 782, 78 L.Ed.2d 574 (1984); *Mazer v. Stein*, 347 U.S. 201, 217, 74 S.Ct. 460, 470, 98 L.Ed. 630 (1954); *Berlin v. E.C. Publications Inc.*, 329 F.2d 541, 543 (2d Cir.), *cert. denied*, 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33 (1964). Recognizing that damages can be difficult to prove, the law generally presumes harm and makes

injunctions easily available. *See Hasbro Bradley Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir.1985). The Copyright Act also provides heavy damage remedies. 17 U.S.C. § 504.

Although the law zealously protects the commercial interests of the artist from unscrupulous opportunistic interlopers, it recognizes that not all copying of artistic invention is necessarily undesirable piracy. Certain forms of copying of artistic creation are indispensable to education, journalism, history, criticism, humor and other informative endeavors; the statute therefore allows latitude in appropriate circumstances for copying of protected artistic expression and exempts such copying from a finding of infringement. The doctrine of *fair use* identifies this category of permissible copying. *See Diamond v. Am–Law Publishing Corp.*, 745 F.2d 142 (2d Cir. 1984); *Consumers Union of United States v. General Signal Corp.*, 724 F.2d 1044, 1048 (2d Cir.1983), *cert. denied*, 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984). It offers a means of balancing the interests of a copyright holder against the public's interest in dissemination of information. *See Meeropol v. Nizer*, 560 F.2d 1061, 1068 (2d Cir.1977) (citing *Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 94 (2d Cir.1977)), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978). The law has never precisely defined fair use, but it has identified factors that are helpful in determining when it is present. These are set forth in Section 107 of the Copyright Act of 1976. 17 U.S.C. § 107.

The statute opens with the proposition that, notwithstanding the exclusive rights of the copyright owner, "fair use of a copyrighted work ... for purposes such as criti-

---

**2.** Norman Starkey, the Executor of Hubbard's estate who licensed plaintiff to exploit the Hubbard copyrights stated in his deposition: "That scum bag book is full of bullshit, man, and you know it. It is full of bullshit.... goddam, fucking bullshit." (Gready Aff.Exh. A, p. 94.) In a prefatory Author's note to the Book, Miller writes,

"I would like to be able to thank the officials of the Church of Scientology for their help in

compiling this biography, but I am unable to do so because the price of their co-operation was effective control of the manuscript and it was a price I was unwilling to pay. Thereafter the Church did its best to dissuade people who knew Hubbard from speaking to me and constantly threatened litigation." (*BFM*, ix.)

cism, comment, news reporting, teaching, ... scholarship or research, is not an infringement." 17 U.S.C. § 107. The statute then sets forth a short nonexclusive list of factors to be considered "in determining whether the use made ... is a fair use...." The factors are:

"(1) the purpose and character of the use [including consideration of commercial or nonprofit purpose];

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market price or value of the copyrighted work."

17 U.S.C. § 107; *see Harper & Row Publishers v. Nation Enterprises,* 471 U.S. 539, 105 S.Ct. 2218, 2225, 85 L.Ed.2d 588 (1985).

The statute provides no real instruction as to how the conclusion is to be drawn upon consideration of these factors. It recognizes that the substance of the issue is the conflict between the justification for copying in serving the objective of public education (in the broadest sense) and the copyright owner's entitlement to reap the profits of labor and talent invested in creative works.

### A. *The Nature of the Copyrighted Work*

■ Plaintiff contends that the second statutory factor—"the nature of the copyrighted work"—is virtually determinative of this controversy. The statute states this factor as an open-ended generality, inviting the court to consider any aspect of the nature of the copyrighted work that has rational bearing on whether its secondary

use should be considered fair. In *Nation* and *Salinger,* the courts found particular importance in the fact that the plaintiff's copyrighted work was previously unpublished. A substantial portion of Hubbard's writings quoted in *Bare-Faced Messiah* have not been published.[3] In plaintiff's list, every citation bearing a number of 70 to 201 is from an unpublished document.

### *The Applicability of Fair Use to Unpublished Work*

■ The principal reason for the difference between published and unpublished work is that for works that have not yet been published, the copyright owner's interests may be affected by choices as to the manner and context of the first public revelation of the work, including the choice whether it should be published at all.

The authorities do not make absolutely clear how to assess a claim of fair use with respect to unpublished copyrighted work. The issue was discussed at length by the Supreme Court in *Nation,* 105 ⁝ S.Ct. at 2226–29. There, *The Nation* had obtained the "purloined" manuscript of President Gerald R. Ford's memoirs and published significant excerpts, which the Court found to be the "heart" of the book, *id.* at 2233 (quoting District Judge Owen's opinion, 557 F.Supp. 1067, 1072 (S.D.N.Y.1983)), shortly before *Time Magazine* was scheduled to publish the first serialization. Upon the pirated publication, *Time* cancelled its option and withheld the unpaid portion of its license fee. The copyright assignee—the hardback publisher—brought suit for damages against *The Nation. The Nation* defended on the grounds that President Ford's memoirs, and in particular the portion in which he discussed his grant of a

---

**3.** Holt argues that many of these works were effectively published when they became part of the court record and were placed on public display during the conduct of a trial brought by the Church of Scientology in an effort to recover the documents from a member (Armstrong) who it claimed had taken them without authorization. Plaintiff disputes whether the court in fact placed the works on public display and also disputes whether such display would alter their unpublished status. Combining the fact that any public display in the course of the Arm-

strong litigation was over objection, with the small number of persons, at most, who saw the works, plaintiff has the better of the argument. If the bringing of a lawsuit to enforce a right necessarily resulted in its sacrifice, the right would be chimerical. *Cf. Marvin Worth Productions v. Superior Films Corp.,* 319 F.Supp. 1269, 1271 (S.D.N.Y. 1970) ("to hold that ... originally copyrighted material becomes somehow dedicated by use in the courts would permit the unraveling of the fabric of copyright protection").

pardon to former President Richard Nixon, was of such public interest that a news report containing excerpts of his discussion must be considered fair use under § 107. The Supreme Court first rejected this contention, commenting that if this correctly stated the law, important public figures would effectively be stripped of copyright protection and would lose incentive to create valuable memoirs. *Id.* 105 S.Ct. at 2224.

The Court began its discussion of the absence of prior publication by noting that at common law, because fair use was understood as predicated on the author's implied consent expressed through publication of his work, there had been no right of fair use where there was no prior publication. *Nation*, 105 S.Ct. at 2226 (citing *American Tobacco Co. v. Werckmeister*, 207 U.S. 284, 299, 28 S.Ct. 72, 77, 52 L.Ed. 208 (1907)). It noted that under the 1976 Copyright Act, this understanding of fair use had changed and that fair use now applied to unpublished as well as published works. The Court recognized the continuing interest of the copyright owner in exercising control over the first publication and observed that "the scope of fair use is narrower with respect to unpublished works." *Id.* 105 S.Ct. at 2232. "Under ordinary circumstances, the author's right to control the first public appearance of his undisseminated expression will outweigh a claim of fair use." *Id.* at 2228. It concluded, "that the unpublished nature of a work is '[a] key, though not necessarily determinative, factor' tending to negate a defense of fair use." *Id.* at 2227 (quoting S.Rep. No. 94–473, p. 64 (1975)). Finally, "fair use analysis must always be tailored to the individual case. The nature of the interest at stake is highly relevant to whether a given use is fair." *Id.* at 2227 (citations omitted).

Given the dishonest acquisition of the manuscript, the revelation of the "heart" of the work, the inequitable gun jumping by which *The Nation* preempted the licensed publication, and the disastrous effect on the market, the Supreme Court had no trouble concluding that *The Nation*'s unauthorized publication was not a fair use.

In *Salinger v. Random House, Inc.*, 811 F.2d 90 (2d Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 213, 98 L.Ed.2d 177 (1987), Ian Hamilton, a biographer of J.D. Salinger, had paraphrased substantial portions of many of Salinger's unpublished letters in a manner which the Court of Appeals found close enough to the original to constitute infringement. The Court reviewed the Supreme Court's discussion of the problem in *Nation*. It found ambiguity in the Supreme Court's observation that " 'the scope of fair use is narrower with respect to unpublished works,' " *id.* at 97 (quoting *Nation*, 105 S.Ct. at 2232), which could mean either that fewer circumstances will justify a finding of fair use of the unpublished material or that a lesser amount of unpublished material may be copied under the mantle of fair use. The Court concluded that the first was the Supreme Court's intended meaning—that "[n]arrower 'scope' seems to refer to the diminished *likelihood* that copying will be fair use when the copyrighted material is unpublished." *Id.* at 97. Otherwise stated, a more potent justification of fair use is required where the copyrighted work has not been published. The Court of Appeals interpreted the Supreme Court's discussion as "convey[ing] the idea that [unpublished] works normally enjoy complete protection against copying any protected expression." *Id.*

Unmistakably these authorities establish that the unpublished nature of the copyrighted work is a substantial factor arguing against a finding of fair use. From the last quoted proposition in *Salinger* using the words "complete protection" plaintiff argues that unpublished copyrighted expression is virtually never amenable to fair use.

That is certainly not a fair inference of the Supreme Court's discussion. To say that "the scope of fair use is narrower with respect to unpublished work" necessarily implies that some such scope exists. To say that the absence of prior publication "is '[a] key, though not necessarily determinative, factor' tending to negate the defense of fair use," *Nation*, 105 S.Ct. at 2227

(quoting S.Rep. No. 94–473, p. 64 (1975)), necessarily means that other factors are capable of supporting the defense. Both the Supreme Court and the Court of Appeals concluded that the Copyright Act expressly made the doctrine of fair use applicable to unpublished work, in departure from the common law rule, *see Nation,* 105 S.Ct. at 2227; *Salinger,* 811 F.2d at 95; it is most unlikely that those courts meant to assert that the statute extended the doctrine in name alone, and that in no circumstances would a copying from unpublished expression qualify for the statutory right.

Such a view, furthermore, would be incompatible with the educational informative objectives of fair use. The protection of an author's commercial interest in controlling the circumstances of first publication is certainly a substantial interest; it is entitled to the vigorous protection of the copyright law. But to make this right inevitably prevail over all competing considerations would lead to absurd results that are almost incompatible with First Amendment interests. By registering a copyright, public figures who are the expected focus of public interest could use this supposed commercial protection as an aggressive weapon to prevent the publication of embarrassing revelations and to obstruct criticism.

It is not a satisfactory answer that the world remains free to use the facts and ideas contained in their writings. Often it is the *words used* by the public figure (or the particular manner of expression) that are the facts calling for comment.

Consider a variety of hypothetical examples:

(i) an art critic argues that recently deceased artist X was taught to render the human figure in perspective during his [4] year of study with teacher Y. To illustrate the point in her book about Y, she reproduces X's unpublished sketch predating his association with Y. She compares the awkwardness of the figure drawing with the refinement of a similar sketch he made a year later;

Voracious heirs of X sue to enjoin distribution of the book (absent payment of a prohibitive ransom) and contend, citing *Salinger,* that the fair use doctrine cannot apply to the unpublished sketch.

(ii) author X's best selling first book has received critical acclaim for its elegance of diction. A critic asserts that the diction came not from X but from a talented editor employed by the publisher. Her review quotes excerpts from the author's manuscript revealing a grammatical chaos and stylistic awkwardness which she contends are incompatible with the elegance of the final product. She declares X to be a literary fraud. X sues to enjoin publication of the review, contending that the critic is appropriating the first publication right of the extracts from his unpublished manuscript;

(iii) politician X campaigns on his decorations for wartime bravery and his strong law and order position. A journalist seeks to publish some of X's old letters which, if read carefully between the lines, seem to acknowledge that he did not participate in combat, was mistakenly decorated and spent his military career as a black marketeer in association with hoodlums;

(iv) a religious leader is renowned for his selfless kindness, liberality of spirit and sympathy for the sufferings of others. A biographer seeks to publish extracts from his early letters and journals which display greed, callous indifference, and employ the language of racial and religious bigotry;

(v) the popular benign mayor of a city sent numerous memos to opponents in various conflicts threatening to "cut your heart out," "castrate you," "bust your kneecaps," etc. A journalist questions the accuracy of the mayor's public image and quotes from these memos.

In each case, the biographer, critic, commentator or journalist—the asserted fair user—has used the copyright owner's expression. Her point cannot be effectively

---

**4.** In hypothetical discussions throughout this opinion the biographer-critic-defendant is presented in the feminine pronoun while the author-copyright holder-plaintiff is presented in the masculine pronoun.

made by merely reciting the facts. In each case, the plaintiff copyright owner protests the defendant's claim of fair use and claims the rights to control first publication of his copyrighted expression.

In my view, each illustration should be considered a fair use. I doubt that the Supreme Court or Second Circuit would disagree. While I can imagine weak arguments that might be offered on the other side of examples (i) and (ii) (because they relate to artistic style), I can conceive of no reasonable contention against a finding of fair use for numbers (iii)–(v). To enjoin their publication would merely be allowing a doctrine designed to protect an artist's commercial rights to be perverted into the service of suppression of important critical or historical inquiry.

A portion of the *Salinger* decision may be misunderstood to imply that the biographer or critic, being limited to reporting the facts, may never quote unpublished protected expression contained in the unpublished copyrighted work. The defendant biographer, when asked why he had copied a stylistic device of Salinger's, responded that he wanted to convey that Salinger had adopted an ironic tone. When then asked why he would not have simply stated that Salinger used an ironic tone, he replied "That would make a pedestrian sentence . . . ," to which the Court commented, "But when dealing with copyrighted expression, a biographer . . . may frequently have to content himself with reporting only the fact of what his subject did, even if he thereby pens a 'pedestrian' sentence. The copier is not at liberty to avoid 'pedestrian' reportage by appropriating his subject's literary devices." *Salinger*, 811 F.2d at 96–97.

It does not follow that the critic may never take copyrighted expression from unpublished documents. Salinger's biographer had no need to prove that in a particular letter Salinger employed an ironic tone. The original writing was quoted to make the biography more vivid—to avoid a "pedestrian" sentence.

The hypothetical examples above differ. In these examples, the *fact* on which the biographer/critic comments *is the protected expression.* The critic in examples (i) and (ii) cannot prove her point about the artist's style, development and talent (or lack) without a quotation as illustration. The journalist/biographer in examples (iii), (iv) or (v) cannot prove to her readers the corruption, bigotry or viciousness of her subject without quoting his words. The words are the "facts" that support the conclusion. Simply to assert the conclusion without the underlying evidence would deprive readers of the opportunity to assess the fairness of the critic's conclusions.[5] The objective of fair use demands that examples like these come within its scope, notwithstanding quotation from unpublished copyrighted sources.

I conclude, as the Supreme Court stated, that the unpublished nature of the copyrighted work tends "to negate a defense of fair use" but is "not necessarily determinative." *Nation*, 105 S.Ct. at 2227–28. This is not the end of the inquiry. I do not think the *Salinger* opinion is to the contrary. The "complete" protection of which it speaks obtains "normally," 811 F.2d at 97, not inevitably. The opinion clarifies that the "narrower" scope of fair use for unpublished material refers to the *diminished likelihood* that fair use will be found in a copying of unpublished material, not impossibility.

5. The problem of attempting to characterize without quotation is illustrated by an amusing consequence of the *Salinger* decision, arising in a book review by Mordechai Richler. *See* Richler, *Rises at Dawn, Writes, Then Retires,* N.Y. Times Book Review, June 5, 1988, at 7 (reviewing I. Hamilton, In Search of J.D. Salinger (1988)). Hamilton rewrote his book, going further in my opinion than the Court of Appeals required, eliminating virtually all paraphrase of Salinger's letters. Instead, Hamilton characterizes. He finds certain youthful letters "self-promoting," "boastful," "fairly buzzing with self-admiration." The reviewer Richler disagrees: "[A]n examination of these letters . . . shows no such thing. They are, in fact, exuberant, self-deprecating and charged with hope." *Id.* at 7. Sensing that his point cannot be made effectively by mere assertion, Richler undertakes to prove it by quoting from the letters that Hamilton deleted.

█ This means that a biographer/critic who purports to make fair use of unpublished copyrighted matter must make a particularly compelling demonstration of justification, upon full consideration of the relevant fair use factors. She must show that her use of the protected expression is not done simply to enliven her text by appropriating her subject's lively expression. The use of the protected expression must be reasonably necessary to the communication and demonstration of significant points being made about the subject and must have no significant adverse effect on the market for the copyrighted work.

*Privacy Interest*

█ Plaintiff further argues that the private nature of some of the Hubbard documents, particularly diaries and personal letters, should favor a finding of infringement. It is universally recognized, however, that the protection of privacy is not the function of our copyright law. The copyright does not protect facts revealed in the work. Factual information derived from a copyrighted work may be freely republished without infringement. *See Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 978 (2d Cir.), *cert. denied*, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980).

It is true that in England in the 19th century there developed a different doctrine known as the "common law copyright" whose purposes included the protection of privacy. *See* Brandeis & Warren, *The Right of Privacy*, 4 Harv.L.Rev. 193, 198–99 (1890); M. Ernst & A. Schwartz, *Privacy* (1962). That doctrine was developed by the British courts, in part, in response to a perceived need for legal protection of privacy in letters and other private papers. The "common law copyright" shared little other than name with the true law of copyright. While true copyright protection was established by publication, common law copyright was established by nonpublication; true copyright protected only expression and not the facts revealed, while common law copyright protected the confidentiality of private facts as well as expression, *see Prince Albert v. Strange*, 2 De G & Sm. 652, 64 Eng. Rep. 293 (1849); and, because its purpose was to protect privacy, fair use was not applicable to the common law copyright.

It is questionable whether the constitutional grant of power to Congress "To promote the Progress of Science and useful Arts...." U.S. Const., Art. 1, § 8, cl. 8, would sustain an exercise of Congressional power to override the state law function of determining privacy rights. There is little or no relationship between the objective of the enabling clause and such a statute that would justify the national government in usurping a state prerogative. But even if Congress has that power, whether under the Copyright Clause, the Commerce Clause, the First Amendment or the Fourteenth, it is clear that Congress has not exercised it in the 1976 enactment. Our copyright law protects only the artistic expression and not the factual content, regardless whether considered private or secret. Fair use is expressly made applicable by our statute to unpublished works, (notwithstanding the "narrower scope" explained in *Nation* and *Salinger*). In addition, our statute requires the copyright owner to make public disclosure of his work as a precondition to protecting his copyright interest.[6] Suit may not be brought to enforce a copyright unless the document sought to be protected has first been publicly filed in the Library of Congress. 17 U.S.C. § 407. When this has been done, it is available to the public as a source for the publication of facts contained in it, free of any restraint contained in the copyright law.

█ Unlike the British courts, furthermore, we have no need to create a protection of privacy under the label of copyright. For in this country under state laws, an explicitly named right of privacy has devel-

---

**6.** *See* Dana, *Copyright and Privacy Protection of Unpublished Works–The Author's Dilemma*, 13 Colum.J.L. & Soc.Probs. 351, 377–78 (1977); Goldstein, *Preempted State Doctrines, Involun-* *tary Transfers and Compulsory Licenses: Testing the Limits of Copyright*, 24 U.C.L.A.L.Rev. 1107, 1115 (1977).

oped through court decision and statute. *See Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 488–89, 95 S.Ct. 1029, 1042–43, 43 L.Ed.2d 328 (1975); W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on The Law of Torts* § 117, at 856–62 (5th ed. 1984). An individual who seeks to protect the privacy of the content of private letters may do so by bringing suit under the right of privacy. That right has developed with remedies and limitations tailored to the policies applicable to privacy. Commentators and courts have agreed that these rights are not preempted by the exclusive jurisdiction asserted by the Copyright Act. *See Factors Etc., Inc. v. Pro Arts, Inc.,* 496 F.Supp. 1090, 1097 (S.D.N.Y.1980) (citing H.R.Rep. No. 94–1476, 94th Cong., 2d Sess. at 132 (1976), U.S.Code Cong. & Admin.News 1976 pp. 5659, 5747), *rev'd on other grounds,* 652 F.2d 278 (2d Cir.1981), *cert. denied,* 456 U.S. 927, 102 S.Ct. 1973, 72 L.Ed.2d 442 (1982); *Allied Artists Pictures Corp. v. Rhodes,* 496 F.Supp. 408 (S.D.Ohio 1980), *aff'd,* 679 F.2d 656 (6th Cir.1982); 1 M. Nimmer, *Nimmer on Copyright* § 1.01[B] at 1–14.3 (1987); Dana, *Copyright and Privacy Protection of Unpublished Works—The Author's Dilemma,* 13 Colum.J.L. & Soc.Probs. 351, 391 (1977); Goldstein, *Preempted State Doctrines, Involuntary Transfers and Compulsory Licenses: Testing the Limits of Copyright,* 24 U.C.L.A.L.Rev. 1107, 1117–18 (1977).

In his recent Horace Manges lecture delivered at the Columbia Law School (soon to be published in the Columbia Law Review), Judge Jon Newman of the Second Circuit argued in favor of absorbing privacy interests into our copyright law. I agree with Judge Newman that our preoccupation with a free press may at times obscure legitimate concerns for privacy. I would agree also that in making a fair use analysis balancing the nature of the protected work with the fair use purpose sought to be served, privacy interests may be an appropriate consideration. If the protected document is highly personal, private and intimate, if the author has a strong personal interest in deferring publication, if the public interest in the contents is minimal and voyeuristic at best (as for example with confidential sorrowful letters of a private individual who is a subject of public concern only because of having been victimized by some terrible crime or misfortune), those might well be factors disfavoring a finding of fair use.

These considerations do not favor this plaintiff, notwithstanding that some of the letters are of a personal nature and that other documents are diaries. In the first place, the author is now dead. The death of the subject is generally understood to terminate a privacy interest. *See Cordell v. Detective Publications, Inc.,* 419 F.2d 989, 990 (6th Cir.1969); *Maritote v. Desilu Productions, Inc.,* 345 F.2d 418 (7th Cir.), *cert. denied,* 382 U.S. 883, 86 S.Ct. 176, 15 L.Ed.2d 124 (1965); *Gruschus v. Curtis Publishing Co.,* 342 F.2d 775, 776–77 (10th Cir.1965); Restatement (Second) of Torts § 652 I (1977). The diaries, furthermore, are not repositories of highly private personal sentiments; they are more in the nature of a travelogue. They were written some sixty years ago which also diminishes the interest in privacy. Most important, this is not a case where the public interest in access to the contents of the documents is slight or unworthy of respect. Hubbard is a figure of great public importance for the great wealth he accumulated and the influence he wielded through his writings and religion. During his life he actively sought publicity. Any privacy interest in the contents of these documents is overwhelmingly outweighed by legitimate public concern. If this suit were brought as an action to enforce the right of privacy, it would fail on many grounds.

### B. *Purpose and Character of the Use*

The first statutory factor is addressed to the "purpose and character" of the secondary use. This refers back to the general proposition in § 107 that fair use of copyrighted material will be permitted for educational purposes "such as criticism, comment, news reporting, teaching, . . ."

*Overall Purpose and Character of the Work*

█ The reference to "purpose and character of the use" invites examination of both the particular quoted passages and the overall character of the secondary-user work. Is it published to serve purposes of the type cited by the statute as legitimate goals of fair use? There can be little doubt that this aspect of the fair use analysis generally favors an overall finding in favor of the biography.

Hubbard is unquestionably a figure of legitimate public concern. As the founder of a religion drawing vast numbers of adherents, as the author of instructive books which have sold millions of copies, and as a figure who at times in his life sought a high degree of publicity and at other times sought seclusion and secrecy, he is a subject of great public interest. If it is arguable (which I do not judge) that his career and the Scientology religion have been advanced through deception, this is certainly a subject appropriate for critical exploration.

It is an uncomfortable role for courts to serve as literary critics, passing on whether a purported work of history, teaching or criticism is entitled to respect as such. We judges generally lack both competence and the necessary information to form such opinions. In this case, because *Bare-Faced Messiah* (in substantially similar form) has been previously published in England, Canada and Australia, reviews have appeared there to which the court may refer for guidance. These credit the book as a serious work of investigation and criticism.

A reviewer for the *London Sunday Times* wrote: "Russell Miller has done a service to his readers by surmounting the legal obstacles placed in his way by the Scientologists who attempted to discredit him and to prevent the publication of his book. It is admirably written, well documented and it must have entailed a great deal of painstaking research. The evidence ... in his book has been gathered carefully from witnesses who were once bemused by the cult and who were fearful of giving him the information he required." (Gready Aff.Exh. D.) A reviewer for *Maclean's Magazine* wrote, "while scathingly critical of Hubbard and his church, *Bare-Faced Messiah* is, in fact, scrupulously fair." (*Id.* Exh. E.) *The Spectator,* in its review, recommended the book for its "admirably detailed documentation." (*Id.* Exh. C.)

The work appears to make responsible use of its material. Although plaintiff disagrees with many of Miller's conclusions and argues that different interpretations can be drawn from the sources, plaintiff does not contend that the biography has dealt dishonestly with its sources or is for any other reason to be denied credit as a serious work of criticism and comment on a highly newsworthy subject.

I do not purport to pass in any way on the accuracy of Miller's reports or on the justification for his conclusions. I do conclude, however, that right or wrong this book is properly considered a work of "criticism, comment, news reporting, teaching," 17 U.S.C. § 107, which is eligible for fair use consideration. This factor favors the defendant.

█ This statutory factor also invites examination "whether such use is of a commercial nature or is for nonprofit education purpose." *See Harper & Row Publishers v. Nation Enterprises,* 471 U.S. 539, 105 S.Ct. 2218, 2231, 85 L.Ed.2d 588 (1985). This issue is often of limited value to the fair use analysis. Even the most valuable educational books are generally published by commercial establishments for profit. Thus, the Court of Appeals stated, "We do not read Section 107(1) as requiring ... a clear-cut choice between ... 'commercial' and 'nonprofit'. Were that the case, fair use would be virtually obliterated, for 'all publications presumably are for profit. ...' " *Maxtone-Graham v. Burtchaell,* 803 F.2d 1253, 1262 (2d Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 2201, 95 L.Ed.2d 856 (1987); *see also Consumers Union of the United States v. General Signal Corp.,* 724 F.2d 1044, 1049 (2d Cir. 1983) ( "[c]ommercial uses also serve the important function of educating the public" ). Scholars and critics do not lose their

license to make fair use by earning their bread from their writing. Occasionally, at extremes, the factor can be significant. Appropriation of copyrighted material for use in a television commercial has been found to carry a low degree of claim to fair use protection. *See Warner Bros. Inc. v. American Broadcasting Companies Inc.*, 720 F.2d 231, 242 (2d Cir.1983); *D.C. Comics v. Crazy Eddie Inc.*, 205 U.S.P.Q. 1177 (S.D.N.Y.1979). In *Salinger*, 811 F.2d at 96, the court found that "Hamilton's purpose in using the Salinger letters to enrich his scholarly biography weighs the first fair use factor in Hamilton's favor, notwithstanding that he and his publishers anticipate profits." I conclude that defendant's profit-making objective does not deprive defendant of its fair use credit for a serious book of responsible historical criticism.

*The Fair Use Purpose of Individual Quoted Passages*

As to each instance of use of a copyrighted passage, the statute invites examination as to why the secondary work has used protected material—what purpose is sought to be accomplished by such use— and then to consider whether the use is "fair." Part of this inquiry will be whether there is convincing justification for use of the protected expression, or whether the purposes of the secondary work would have been equally well served by extracting unprotected content, such as facts and ideas contained in the passage, without using protected expression.

■■■ Notwithstanding the general critical or historical purpose of the work, if a particular passage is cited only for the factual information contained in it, the copyright · owner's particular expression may be of small importance to the biographer's purpose. In such a case the fair use justification would be slight. *See Salinger*, 811 F.2d at 96–97. Justification also would be questioned if the use of the protected expression in the biography had no real purpose other than to display the distinctiveness of the subject's writing be-

cause this would be taking precisely what the copyright is designed to protect. *See Salinger*, 811 F.2d at 96; *Craft v. Kobler*, 667 F.Supp. 120, 127 (S.D.N.Y.1987). On the other hand, in cases where the biographer's point of significance about the subject's character cannot be made effectively without quotation of the subject's particular words, justification will be far greater. *See Maxtone–Graham v. Burtchaell*, 803 F.2d 1253, 1261 (2d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 2201, 95 L.Ed.2d 856 (1987); *Consumers Union of the United States v. General Signal Corp.*, 724 F.2d 1044, 1049–50 (2d Cir.1983), *cert. denied,* 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed. 2d 45 (1984).

I have begun by comparing each cited passage with the source material. For each passage that involves the taking of protected expression, I have made an analysis of fair use purpose. A table, giving the court's observations on each challenged passage, is filed as an appendix to this opinion.* Miller's fair use ˙purposes are discussed below.

I stress that in passing on the disputed contention of fair use, I draw no conclusion as to the ultimate merits of the underlying disagreement between the adherents of Hubbard and the biographer as to the merits of criticisms contained in the biography. There is, of course, great antagonism and factual dispute between them. There is no evidence before the court as to where the truth lies. It is not part of my task to make such conclusions. *See Maxtone–Graham v. Burtchaell*, 803 F.2d 1253, 1261 (2d Cir.1986). I limit myself to analysis of the fair use purposes and the justification asserted.

■■■ I conclude, for reasons explained below, that the very large majority of Miller's takings of Hubbard material display a powerful and compelling fair use purpose. These are not, as the Court of Appeals found in *Salinger* and this court found in *Craft,* appropriations of the literary talent of the subject to enliven and improve the secondary work. They are, rather, instanc-

* Editor's Note: Appendix omitted by the court for purposes of publication.

es akin to hypothetical examples (iii)–(v) above where the critic exhibits chosen words of the subject to prove a critical point or to demonstrate a flaw in the subject's character.

It is a principal objective of Miller's biography to argue and prove that Hubbard's dominating traits of character included dishonesty, boastfulness and pretension, paranoia, bigotry and snobbery, cruelty and disloyalty, aggressiveness, cynicism and derangement at times approaching insanity. The vast majority of Miller's takings of Hubbard's words are to demonstrate these observations.

### 1. The Church's False Mythology of the Founder

The Introduction to Miller's book asserts:

> For more than thirty years, the Church of Scientology has vigorously promoted an image of its founder, L. Ron Hubbard, as a romantic adventurer and philosopher whose early life fortuitously prepared him, in the manner of Jesus Christ, for his declared mission to save the world. The glorification of 'Ron', superman and saviour, required a cavalier disregard for facts: thus it is that almost every biography of Hubbard published by the church is interwoven with lies, half-truths and ludicrous embellishments. The wondrous irony of this deception is that the true story of L. Ron Hubbard is much more bizarre, much more improbable, than any of the lies. (*BFM* 1.)

Thereafter a central theme of the biography is to set forth the image of the mythological super hero promulgated by Hubbard's own writings and by the publications of the Church of Scientology and to show that their claims concerning Hubbard and his ministry are false. The first 15 chapters begin with characterizations and brief excerpts from Church and autobiographical publications which establish the Hubbard mythologies. The chapters then undertake to demonstrate the falsity of such claims. The takings consist of a few sentences or phrases from book-length works. Some examples [7] follow:

7. The quotations in the text are examples. My findings as to each category are contained in the

*Chapter 1*

According to the colorful yarn spun for the benefit of his followers, L. Ron Hubbard was descended ... from a French ... Count ... who took part in the Norman invasion of England in 1066 ... English settlers who had arrived in America in the Nineteenth Century ... [and] a distinguished naval family.... [T]he story goes, little Ron grew up on his wealthy grandfather's enormous cattle ranch in Montana, said to cover a quarter of the state [approximately 35,000 square miles!].... 'L. Ron Hubbard found the life of a young rancher very enjoyable. Long days were spent riding, breaking broncos, hunting coyote and take his first steps as an explorer. For it was in Montana that he had his first encounter with another culture—the Blackfoot [Pikuni] Indians. He became a blood brother of the Pikuni and was later to write about them in his first published novel, *Buckskin Brigades*.' ... (No. 1, *BFM* 7.)

The biographer asserts, "Virtually none of this is true." (*BFM* 7.)

*Chapter 2*

Fundamental to the image of L. Ron Hubbard as prophet are the tales of his teenage travels.... In the high hills of Tibet he lived with bandits who accepted him because of his 'honest interest in them and their way of life'.... On an unnamed island in the South Pacific, the fearless boy calmed the natives by exploring a cave that was supposed to be haunted and showing them that the rumbling sound from within was nothing more sinister than an underground river. 'Deep in the jungles' of Polynesia he discovered an ancient burial ground 'steeped in the tradition of heroic warriors and kings ... Though his native friends were fearful for him, he explored the sacred area—his initiative based on doing all he could to know more.' (Nos. 4, 5, 6, *BFM* 26.)

Appendix. [Editor's Note: Appendix omitted by the court for purposes of publication.]

*Chapter 3*

Hubbard's amazing adventures as an explorer are graphically described in *Mission Into Time*, a book published by the Church of Scientology. It seems that Hubbard spent more than four years, from 1925 to 1929, journeying throughout Asia, financed on his travels by his 'wealthy grandfather'....

In 1931 ... he [became] director, at the age of twenty, of the Caribbean Motion Picture Expedition, which apparently provided invaluable research of the University of Michigan....

Yet this was nothing compared to what was to come in 1932, when L. Ron Hubbard demonstrated his true worth as 'an exceptional explorer' by carrying out, as leader of the West Indies Mineral Survey, the first complete mineralogical survey of Puerto Rico. 'This was pioneer exploration in the great tradition, opening up a predictable, accurate body of data for the benefit of others....' (No. 8, *BFM* 40.)

The purpose of Miller's quotations is to show first the mythological presentation of Hubbard by the Church and second to show their falsity. The biography undertakes to show that contrary to the Church mythology cited above, Hubbard led a relatively humdrum, banal and impecunious life in a small town. There was no wealthy grandfather and no gigantic ranch. Although it is true he traveled to the Orient to visit his father who was stationed with the Navy in Guam, the romantic claims of adventure are fabricated. For example,

[N]o trace may be found of the many contributions to science which Ron claimed on behalf of the Caribbean Motion Picture Expedition. The Hydrographic Office has no record of receiving the expedition's underwater films, the University of Michigan can find none of the specimens brought by the 'gentleman rovers'.... Mystery similarly surrounds the West Indies Minerals Survey, that 'pioneer exploration in the great tradition' during which Ron is said to have completed the first mineralogical survey of Puerto Rico. This would certainly have been an impressive achievement for a twenty-one-year-old civil engineering

student, but the US Geological Survey knows nothing about it, neither does the Puerto Rican Department of Natural Resources.... (*BFM* 56–57.)

 I conclude that these brief quotations present a strong fair purpose. The biographer's purposes could not be wholly accomplished by merely citing the facts alleged to be false, without the manner of expression. The copying is justified first to convey the grandiose presentation of Hubbard. Some of the passages are quoted not to show falsity but to show the aggrandized, boastful, pretentious mythic idiom employed by the Church in its descriptions. (*See, e.g.*, Nos. 30, 67.) Second, when the objective of a critic is to show falsity of the original, she should be allowed to quote so that she can state with precision the exact contours of the assertion she undertakes to disprove. Truthfulness and falsity often lie in characterization and emphasis, rather than in simple factual assertion. If the critic must characterize rather than quote the challenged assertion, the reader will have no ability to judge independently whether the subject in fact said what he is charged with, or whether his statements were false as claimed. Such quotation serves importantly the fair use purposes of research, history, criticism, comment and news reporting.

### 2. Hubbard Dishonesty

Over thirty of the passages cited by plaintiff involve copyrighted material that is quoted to show personal dishonesty on Hubbard's part, including what Miller characterizes as lies with respect to Hubbard's experiences (Nos. 1, 2, 3, 17, 51, 52, 106–114, 193 and 199), his qualifications (Nos. 7, 22, 49, 50, 53, 54, 194), and his monetary entitlements (Nos. 151–160).

For example, in the chapter entitled "The Hero Who Never Was," Miller describes Hubbard's wartime Navy career as incompetence, misadventure, cowardice and vainglorious dreams of heroism without ever seeing combat, all of which were soon transformed into a fabricated, baseless history of heroism. Miller writes that three

days after the Japanese surrender, Hubbard was admitted to a Naval hospital in Oakland, California "not as a result of heroic war wounds, but to be treated for 'epigastric distress' ... a suspected duodenal ulcer.... He, of course, saw it somewhat differently:

> 'Blinded with injured optic nerves, and lame with injuries to hip and back, at the end of World War Two I faced an almost non-existent future ... I was abandoned by family and friends as a supposedly hopeless cripple and a probable burden upon them for the rest of my days ... I became used to being told it was all impossible, that there was no way, no hope. Yet I came to see and walk again ...'" (No. 17, *BFM* 110.)

Miller goes on quoting Hubbard's later reminiscences in a copyrighted lecture in which he describes that hospitalization as recuperation "from an accumulation of too much wartime Scotch and overdoses of lead." (No. 52, *BFM* 231.) The biography also quotes (Nos. 151–160) passages from a series of letters to the Veterans Administration in which Hubbard made what Miller describes as false claims for a pension based on nonexistent wartime injuries. According to the biography, after the award of a disappointingly small military pension, Hubbard lodged an appeal, "producing a dramatic new disability which he had somehow neglected to mention in his original claim form.

> 'I have lost between sixty and eighty percent of my vision,' he claimed.... 'My income at the present time, due entirely to service connected injuries, is zero....'" (No. 151, *BFM* 125.)

Thereafter on July 4 he had spent part of the holiday composing "yet another stirring appeal ... and introducing a further hitherto unmentioned disability, this time a 'chronic and incapacitating bone infection'." (No. 153, *BFM* 128.)

The contention of the biography is that in wartime service Hubbard saw no combat, acquired neither "overdoses of lead," nor other incapacitating injuries, that his claims were false, self-dramatizing and fraudulent.

Another series of passages, quoted by Miller from Hubbard's unpublished *Asia Diaries 1927–1929* (Nos. 106–114), are used to show Hubbard's proclivity to exaggeration, self-aggrandizement and falsity. These passages taken from two separate accounts in his diaries describe Hubbard's sudden departure from Helena, Montana, and his voyage aboard a naval vessel to visit his father in Guam. Miller states, "Although they were represented by a few pages in his journal, many of the details do not match; indeed some passages read suspiciously like the adventure stories he was constantly scribbling." (*BFM* 37.) These episodes, full of drama, near disaster, and last-second intervention of good fortune are argued by Miller to be false.

Hubbard describes, for example, how thanks to a series of last-minute breaks in his favor, he was able to board the U.S.S. Henderson only an hour before she was due to sail. The ship's log in contrast shows that he boarded nearly 24 hours before her departure. As to permission of the Navy to board, which Hubbard's diary claimed he did not know he needed until approximately two days before the ship's departure, military records obtained by Miller show that Hubbard had submitted a formal application for a passage on the Henderson more than a month before his departure. (Nos. 106–113, *BFM* 38.) At the conclusion of the diary account, Hubbard wrote, and Miller quotes (No. 114, *BFM* 39), "I will tell you the secret of this strange life I led. Sssh! I was born on Friday the Thirteenth." This also, Miller observes, was not true. Hubbard was born on a Monday.

 As noted in the preceding section discussing the Church-sponsored mythology, when the purpose of a reference is to show that the copyrighted matter was dishonest, the fair use doctrine must accord substantial latitude to quote copyrighted expression, so that the claim of falsity can be leveled with precision at the exact utterance. It is incompatible with the ends of fair research and criticism to accuse of dishonesty without being permitted to specify what were the dishonest words. Such a

purpose argues strongly in favor of a finding of fair use.

### 3. Boastfulness, Pomposity, Grandiosity, Pretension, Self–Importance

In many cited passages, Hubbard's copyrighted material is used by the biographer to illustrate his boastful and pompous mannerisms, or his grandiosity, pretension or self-importance.

Of his book entitled *Dianetics*, Hubbard wrote, and Miller quotes, that it is "a milestone for Man comparable to his discovery of fire and superior to his inventions of the wheel and the arch.... The hidden source of all psychosomatic ills and human aberration has been discovered and skills have been developed for their invariable cure." (Nos. 18–19, *BFM* 155.)

Another Hubbard book, *The History of Man*, he introduced as "a cold-blooded and factual account of the last sixty trillion years." With the insights gained from this book and Scientology, "the blind again see, the lame walk, the ill recover, the insane become sane and the sane become saner." (Nos. 38–39, *BFM* 204.) His discoveries make it "possible at last to vindicate the theory of evolution proposed by Darwin." (No. 36, *BFM* 204.)

Of his manuscript *Excalibur*, Hubbard wrote in a letter which Miller quotes, "I have high hopes ... of smashing my name into history so violently that it will take a legendary form." (No. 145, *BFM* 81.)

Upon his short-lived move to Rhodesia at the time of its independence in 1966, he unsolicitedly drafted and sent to the Government a "Tentative Constitution of the Nation of Rhodesia." "Before God and man we pledge ourselves, the Government of Rhodesia and each of our officers and men of authority...." (Nos. 197–98, *BFM* 258).

As examples of the early development of Hubbard's pretentiousness, Miller quotes a melodramatic entry from his youthful diaries written at age 18, "Another boat caught. Is ever thus?" (No. 117, *BFM* 41.) Miller notes that "At the age of eighteen ... writing as if he was a well travelled man of the world, a carefree, two-fisted, knockabout adventurer" (*BFM* 44), Hubbard wrote of

the untrustworthy, lying, cruel, changeable satirical Lady Luck.... This humorist of humorists, this demon of demons has dragged men from their places in the sun into the slime of oblivion; has made beggars kings; has, with a whisper, made and crushed thousands; has laughed at the beings who supposed they ruled our destinies; and has killed enough men to patch hell's highway its blistering length. (No. 140, *BFM* 44.)

Other passages which I find to fall into this category of strong fair use purpose involve Hubbard's boasts of his talents and qualifications. In one, quoted above, he claimed to have learned an Asian primitive language, "Igoroti," "in a single night." (No. 7.)

I remember one time learning Igoroti, an Eastern primitive language, in a single night. I sat up by kerosene lantern and took a list of words that had been made by an old missionary in the hills of Luzon [Philippines]. The Igorot had a very simple language. This missionary phoneticized their language and made a list of their main and their usage and grammar. And I remember sitting up under a mosquito net with mosquitoes hungrily chomping their beaks just outside the net, and learning this language—three hundred words—just memorizing these words and what they meant. And the next day I started to get them in line and align them with people, and was speaking Igoroti in a very short time. (No. 7, *BFM* 26.) [8]

In passages Nos. 49–50, he purports to possess qualification to assess the medical dangers of radiation, "more of a mental than a physical problem." (*BFM* 227.) He wrote to the FBI:

I am trying to turn out some monographs on matters in my field of nuclear physics and psychology for the govern-

---

**8.** In some places the passage alleged to be infringing in plaintiff's table differs from the passage in the book. The passages quoted above reflect the author's actual text.

ment on the subject of alleviating some of the distress of radiation burns, a project I came east to complete. (No. 192, *BFM* 222.)

In instructions to his press officer, he stressed the importance of emphasizing that he worked in the field of "nuclear physics on life sources and life energy" so as to avoid the pejorative label of "psychiatrist or spiritualist." (No. 194, *BFM* 238.)

■ Qualities such as boastfulness, pomposity, pretension and self-importance cannot be effectively conveyed by a biographer/critic without quotation. It is the subject's conception of himself that the biographer seeks to convey through the subject's own words. Indeed, this argument is supported by the plaintiff's contention that this quoted material and others cited elsewhere appears unflattering to Hubbard only because of Miller's "bias and slant," Long Aff. ¶ 28, and that "there are two sides to every coin." *Id.* ¶ 29. All the more reason to let the readers make their own judgment based on the original material rather than to force them to accept or reject blindly the biographer's characterization. These are compelling examples of a strong fair use purpose.

### 4. Paranoia

At least five of the biography's well-justified uses of copyrighted passages are to show Hubbard's paranoia (Nos. 29, 58–59, 65, 191).

A passage from a Church publication asserted that the U.S. Government, resentful of Hubbard's resignation from the Navy, and wishing "to monopolize all his researches ... tried to blackmail him [and] soon began vicious, covert international attacks upon his work...." (No. 29, *BFM* 163). A Church bulletin described two armed secret service agents, after an innocent reference to President Nixon in a Scientology magazine, "[h]ulking over desks, shouting violently, ... stated that they daily had to make such calls on 'lots of people' to prevent Nixon's name from being used in ways Nixon disliked...." (No. 58, *BFM* 240.) In a letter to the FBI Hubbard complained of persecution of

Scientologists, "some of whom were being mysteriously driven insane, possibly by the use of LSD, 'the insanity producing drug so favoured by the APA [American Psychological Association]'." (No. 191, *BFM* 222.)

In another letter to the FBI he wrote that:

[H]is 'alleged wife' had caused him to make out a will leaving her shares in the copyrights and Foundations. Later when he was asleep ... he was 'slugged'.... his health had been poor thereafter. Arriving in Los Angeles, his wife left their baby unattended in a car and he was arrested for it—'I could never understand why.' ... 'On December 5, while asleep in my apartment ... in Los Angeles, I was again attacked and knocked out. When I woke I debated considerably about going to the police but was again afraid of publicity for again I did not know who might have done this.' ... 'I was in my apartment on February 23rd, about two or three o'clock in the morning when the apartment was entered, I was knocked out, had a needle thrust into my heart to give it a jet of air to produce "coronary thrombosis" and was given an electric shock with a 110 volt current. This is all very blurred to me. I had no witnesses. But only one person had another key to that apartment and that was Sara.' (Nos. 164–68; *BFM* 190.)

### 5. Snobbery, Bigotry, Disdain for Asians

A number of passages from Hubbard's unpublished *Asia Diaries 1927–1929* are quoted for the purpose of showing his bigotry, his outspoken disdain for Asians, and dislike for the Orient. A few examples follow. " 'When it comes to the Yellow Races overruning the world, you may laugh,' he noted.... '[The Chinese] have neither the foresight or endurance to overrun any white country in any way except by intermarriage. One American marine could stand off a great many yellowmen without much effort.' " (Nos. 127–29, *BFM* 42.) "They smell ... of all the baths they didn't take. The trouble with China

is, there are too many Chinks here." (No. 133, *BFM* 43.)

In several passages (Nos. 122–126, *BFM* 42), Hubbard expresses disdain for masterpieces of Chinese architecture and art. The Temple of Heaven, which Miller characterizes as "probably the supreme achievement of traditional Chinese architecture," Hubbard considered " 'very gaudy and more or less crudely done.' " (No. 122, *BFM* 42.) "The summer palace was 'very cheap as to workman-ship' and the winter palace was 'not much of a palace in my estimation.' " (No. 123, *BFM* 42.) "The Lama temple ... was 'miserably cold and very shabby ... The people worshipping have voices like bull-frogs'.... As for the Imperial palaces in the Forbidden City, one was 'very trashy-looking' and most of the others were 'not worth mentioning'." (Nos. 124–25, *BFM* 42.)

 Quotation from criticism can involve problematic assertions of fair use. The original author was himself expressing critical judgments protected by the copyright. The exception to copyright protection for fair use cannot be permitted to swallow the basic right. To use an exaggerated example of the problem, the subsequent critic or biographer could not justify extensive quotation, effectively usurping the original criticism, simply by asserting that she was quoting it to show how astute and incisive the subject's criticism was. This would be all the more true where the copyrighted matter was unpublished. With these cautions in mind, I conclude nonetheless that these brief quotations from unpublished copyrighted work display a compelling fair use purpose. In no sense does Miller appropriate Hubbard's expression of his art criticism to add vigor and vividness to the secondary text. These quotations are in mockery, to show Hubbard's bigotry, bias and coarse lack of taste. This is not an instance of the biographer/critic free riding on the creative talent of the subject.

### 6. Cruelty, Disloyalty

Two letters concerning a bigamous marriage that was acrimoniously terminated in 1951 are quoted in part to depict Hubbard's vindictive cruelty and disloyalty. The use of his words serves a strong fair use purpose.

According to the biography, the marriage ended after Hubbard tried unsuccessfully to kidnap their baby daughter from his wife. After the failure of his kidnap attempt, Hubbard never saw his wife or baby again. The first letter (quoted in the preceding section) was written to the FBI shortly after the breakup and was designed for revenge. In this letter, written during McCarthyite hysteria over communist infiltration, Hubbard gratuitously told the FBI that his recently estranged wife was involved with communists and also "was strangely intimate with many [atomic] scientists of Los Alamo Gordos...." He accuses her of attempts to murder him and adds "[s]he was born into a criminal atmosphere, her father having a criminal record. Her half-sister was an inmate of an insane asylum. She was part of a free love colony in Pasadena.... She may have a record...." (No. 161–74, *BFM* 191.)

The second letter was written 20 years later to the daughter Alexis whom Hubbard had tried to kidnap. The girl, then 21 years old, wrote to her father in the hope of meeting him. Hubbard wrote back. He "denied he was her father: 'Your mother was with me as a secretary in Savannah in late 1948 ... In July 1949 I was in Elizabeth, New Jersey, writing a movie. She turned up destitute and pregnant'.... Hubbard told Alexis that her mother had been a Nazi spy during the Second World War and suggested that the divorce action was a spurious ploy on her part to win control of Scientology— ... 'This proved a puzzle since where there is no legal marriage, there can't be any divorce.' " (No. 200, *BFM* 306.)

### 7. Aggressiveness, Vicious and Scheming Tactics

Several passages are quoted to illustrate Hubbard's aggressiveness and vicious scheming tactics against perceived enemies. Miller writes, quoting Hubbard:

'The law can be used very easily to harass, and enough harassment on some-

body who is simply on the thin edge anyway, well knowing that he is not authorized, will generally be sufficient to cause his professional decease,'

he wrote in one of his interminable bulletins, casually adding,

'If possible, of course, ruin him utterly.' (No. 47, *BFM* 223.)

'The only way to defend anything, Hubbard wrote, was to attack. If you ever forget that you will lose every battle you are ever engaged in'. (No. 48, in part, *BFM* 223.)

'Don't ever defend, always attack. Don't ever do nothing. Unexpected attacks in the rear of the enemy's front ranks work best.' (No. 63, in part, *BFM* 241.)

An example of his own practice of these tactics is cited in his letter to the FBI (Nos. 161–174, *BFM* 189–91), denouncing his recently estranged wife as a communist and a threat to national security.

### 8. Cynicism

Miller uses several short passages from Scientology bulletins and letters to illustrate Hubbard's cynicism. In one instructive bulletin to Scientology members captioned the *Special Zone Plan*, Hubbard shows how Scientologists should seek insidiously to exert influence in politics. "Don't bother to get elected.... Get a job on the secretarial staff or the bodyguard." (No. 60, *BFM* 241.) To a trusted confidant Helen O'Brien, Hubbard wrote discussing "the possibility of setting up a chain of ... 'Spiritual Guidance Centers'. They could make 'real money', he noted, if each clinic could count on ten or fifteen pre-clears [people who have not yet cleared a stage of emotional evolution through Scientology] a week, each paying $500 for twenty-four hours of auditing. He had clearly previously discussed the prospect of converting Scientology into a religion. 'I await your reaction on the religion angle,' he wrote. 'In my opinion, we couldn't get worse public opinion than we have had or have less customers with what we've got to sell. A religious charter would be necessary in Pennsylvania or NJ to make it stick. But I sure could make it stick.'" (Nos. 176–77, *BFM* 212–13.)

A major point in the biography is the cynical mercenary origin which Miller finds in Hubbard's conception of the Scientology religion. The book recites instances in which early in his life Hubbard had mused on religion as a possible source of wealth. The passage cited above from the letter to Helen O'Brien is particularly significant for the biographer's attempt to trace the foundation of the religion to greed for money.

As one of the major themes of the biography is the dishonesty of Hubbard and his role as "a con man" (*BFM* 6), the excerpts from Hubbard's writings which contain apparent acknowledgements of dishonesty and espousal of a strategy or philosophy of deception are particularly important. In a published dictionary which he entitled *Modern Management Technology Defined*, Hubbard preached "Truth is what is true for you." (No. 69, *BFM* 348.) This principle was apparently derived from a Commander Thompson, one of Hubbard's inspirations, whom Hubbard credited with the aphorism "If it's not true for you, it's not true." (*BFM* 231.) The reference was included in a typed and copyrighted lecture given by Hubbard in Washington in 1958, reviewing his history and that of Dianetics and Scientology. The lecture contains numerous references to the tactic of deceit. Hubbard recounts in it how at the military hospital (where he was recovering from "overdoses of lead"):

I found that by taking off one collar ornament I became an MD. They don't let anybody in a medical library except doctors but by stopping off with one collar ornament and for a couple of bucks having a Marine on crutches come by and say, "Good Morning, doctor", I was able to get in a year's study at the medical laboratory. (No. 53, *BFM* 231.)

Later on, the narration continues, "I went down to the middle of Hollywood, rented an office, wrapped a towel around my head and became a swami." (No. 54, *BFM* 231.) " '[I]f there is anyone in the world calculated to believe what he wants to believe, it is I.' Never [Miller observes] did L. Ron Hubbard speak a truer word." (No. 55, *BFM* 231.)

Functionally-related fair use passages are those in which Hubbard instructed O'Brien to devise "a spurious explanation" of the function of a machine being imported [in fact intended to cure insanity] "for the benefit of the Customs officials" (No. 185, *BFM* 214); and in which, after instructing his press aide to "emphasize constantly that he was working in the field of 'nuclear physics'," Hubbard added in what Miller describes as "a rare moment of candor," " 'This ... will take some doing, perhaps.' " (No. 194, *BFM* 238.)

### 9. Derangement, Insanity, Bizarre Pseudo–Science

A major theme of Miller's book is the bizarreness of Hubbard's pseudo-science, particularly as expressed in his major works on Dianetics and Scientology.

One of Hubbard's most important and widely sold works was *Dianetics: The Modern Science of Mental Health*, first published in 1950. According to the plaintiff, the book remains on the national best seller lists 38 years after publication. It has been on *Publishers Weekly* best seller list for 85 consecutive weeks since September 1986 and on *The New York Times* best seller list for 49 weeks. The book currently sells in excess of 7,000 copies per week. Heldt Aff. ¶ 7. It is a book of approximately 170,000 words (several hundred pages). To illustrate the strangeness of its pseudo-science and the boldness of Hubbard's claims, Miller quotes in Chapter 9 approximately 33 lines (including less than 300 words) which are claimed as infringement. (Nos. 18–28.)

The quoted passages begin with Hubbard's claim in the opening sentences that "The creation of Dianetics is a milestone for Man comparable to his discovery of fire and superior to his inventions of the wheel and of the arch ... The hidden source of all psychosomatic ills and human aberration has been discovered and skills have been developed for their invariable cure." (No. 18, *BFM* 155.)

Miller notes that Hubbard claimed ability to cure asthma, eye trouble, bursitis, ulcers and the common cold, through new techniques of psychotherapy that were easy to learn, available to everyone and always worked. (*BFM* 155.) The cure involved gaining access to "engrams," or messages of pain and fear "often prenatal, sometimes occurring within 24 hours of conception!" (*BFM* 154.)

Miller notes that this science was imbued with Hubbard's "fierce prejudices," in particular his "hatred of women, exemplified by a prurient pre-occupation with 'attempted abortions' which he claimed were the most common cause of pre-natal engrams. 'A large proportion of allegedly feeble-minded children', he wrote, 'are actually attempted abortion cases ... However many billions America spends yearly on institutions for the insane and jails for the criminals are spent primarily because of attempted abortions done by some sex-blocked mother to whom children are a curse, not a blessing of God ... All these things are scientific facts, tested and re-checked and tested again.' " (Nos. 20–22, *BFM* 155–56.)

Miller describes other of Hubbard's claims. "If a husband beat his pregnant wife, for example, yelling, 'Take that! Take it, I tell you. You've got to take it!', it was possible the child would interpret these words literally in later life and become a thief. Or a pregnant woman suffering from constipation might sit straining for a bowel movement muttering to herself, 'Oh, this is hell. I am all jammed up inside. I feel so stuffy I can't think. This is too terrible to be borne'. In this case, he explained, the child might easily develop an inferiority complex from an engram which suggested to him he was too terrible to be 'born.' " (Nos. 23–24, *BFM* 156.)

These brief excerpts from a very long and famous book intended to illustrate the bizarre quality of Hubbard's thought serve an altogether appropriate critical and educational fair use purpose. This is not an instance of using the copyright owner's literary skill to enhance the quality of writing in the biography. The purposes of the quotations are critical—suggesting that Hubbard's philosophy is bizarre, if not insane.

The same observations are true of a few excerpts from *The History of Man*, in which Hubbard established the foundations of Scientology. Miller's purpose in quoting appears from his observation that this was "one of Hubbard's most bizarre works and possibly the most absurd book ever written, although it was treated with great reverence by [Hubbard's] followers. An amalgam of mysticism, psychotherapy and pure science fiction, the content invited the derision which was inevitably forthcoming.... [O]ne government report noted, 'For compressed nonsense and fantasy it must surpass anything theretofore written.'" (*BFM* 204.)

Miller quotes the claims of the introduction to represent "a cold-blooded and factual account of your last sixty trillion years.... With the knowledge gained by Scientology ... 'the blind again see, the lame walk, the ill recover, the insane become sane and the sane become saner.'" (Nos. 38–39, *BFM* 204.) A strong example of Miller text, including segments of quotation to show the bizarre character of Hubbard's "scientific" explorations, is set forth in the margin.[9]

**9.** In a narrative style that wobbled uncertainly between schoolboy fiction and a pseudo-scientific medical paper, Hubbard sought to explain that the human body was occupied by both a thetan and a 'genetic entity', or GE, a sort of low-grade soul located more or less in the centre of the body. (*BFM* 204.)

To underpin his new science, Hubbard created an entire cosmology, the essence of which was that the true self of an individual was an immortal, omniscient and omnipotent entity called a 'thetan'. In existence before the beginning of time, thetans picked up and discarded millions of bodies over trillions of years. (*BFM* 203.)

('The genetic entity apparently enters the protoplasm line some two days or a week prior to conception. There is some evidence that the GE is actually double, one entering on the sperm side ...') The GE carried on through the evolutionary line, 'usually on the same planet', whereas the thetan only came to earth about 35,000 years ago to supervise the development of caveman into homo sapiens. Thus the GE was once 'an anthropoid in the deep forests of forgotten continents or a mollusc seeking to survive on the shore of some lost sea'. The discovery of the GE (Hubbard hailed every fanciful new idea as a 'discovery') 'makes it possible at last to vindicate the theory of evolution proposed by Darwin'.

Much of the book was devoted to a re-working of evolution, starting with 'an atom, complete with electronic rings' after which came cosmic impact producing a 'photon converter', the first single-cell creature, then seaweed, jellyfish and the clam. (Nos. 33–37, *BFM* 204.)

Many engrams, for example, could be traced back to clams. The clam's big problem was that there was a conflict between the hinge that wanted to open and the hinge that wanted to close. It was easy to restimulate the engram caused by the defeat of the weaker hinge, Hubbard pronounced, by asking a pre-clear to imagine a clam on a beach opening and closing its shell very rapidly and at the same time making an opening and closing motion with thumb and forefinger. This gesture, he said, would upset large numbers of people.

'By the way,' he warned, 'your discussion of these incidents with the uninitiated in Scientology can cause havoc. Should you describe the "clam" to some one [sic], you may restimulate it in him to the extent of causing severe jaw pain. One such victim, after hearing about a clam death, could not use his jaws for three days.'

After the clam became the 'Weeper' or the 'Boohoo', a mollusc that rolled in the surf for half a million years, pumping sea water out of its shell as it breathed, hence its name. Weepers had 'trillions of misadventures', prominent among them the anxiety caused by trying to gulp air before being swamped by the next wave. 'The inability of a pre-clear to cry,' Hubbard explained, 'is partly a hang-up in the Weeper. He is about to be hit by a wave, has his eyes full of sand or is frightened about opening his shell because he may be hit.' (Nos. 40, 41 in part, *BFM* 205.)

Progressing along the genetic time-track, evolution arrived at the sloth, which 'had bad times falling out of trees', the ape and the famous Piltdown Man, which was the cause of a multitude of engrams, ranging from obsessions about biting to family problems. These could be traced back to the fact that 'the Piltdown teeth were enormous and he was quite careless as to whom and what he bit.' Indeed, so careless was the Piltdown Man, Hubbard recorded, that he was sometimes guilty of 'eating one's wife and other somewhat illogical activities.' (No. 42) (Unfortunately for Hubbard, just twelve months after *The History of Man* was published, the supposed fossil remains of primitive man found in gravel on Piltdown Common in the south of England were exposed as a hoax. The Piltdown Man had never existed. (*BFM* 205.)

*The History of Man* drifted into pure science fiction when Hubbard came to the point of explaining how thetans moved from body to body. Thetans abandoned bodies earlier than GEs, it appeared. While the GE stayed around to see the body through to death, thetans were obliged to report to a between-lives 'implant station' where they were implanted with a varie-

Other passages quoted as suggestive of deranged self-aggrandizement include Hubbard's claim (from an unpublished letter) that with a new machine:

> I can make kids walk in a few minutes who were crippled ... I can solve any case and teach people to solve any case without failure. I know the mind like a surveyor knows a map. That sets me free, like the genie of the uncorked bottle. (No. 186, *BFM* 214.)

and his expectation that with this machine, he could

> walk into a sanitorium ... confront an insane patient and make him sane in a few seconds. (No. 183, *BFM* 213–14.)[10]

▃▃▃ Once again these passages show a compelling fair use purpose. Where the biographer's intention is to show derangement of the mind of his subject, this often requires quotation of his words. In the subtlety of the exact words chosen can be the difference between exuberant optimistic enthusiasm and delusional derangement. The biographer/critic should not be required simply to express her conclusions without defending them by example. This would be unfair to her, but more importantly, unfair also to her public readership which would be left unable to assess whether the observation was a fair one.[11] I believe that quotation of copyrighted expression for this purpose implicates a convincing fair use purpose.

### 10. Self–Presentation in Early Diaries

A few sentences are quoted to illustrate Hubbard's egocentric self-perception in his early diaries. Miller writes:

> His style of writing was fluent, breezy, schoolboyishly cocksure and addressed directly to the reader. 'If obviously pushed upon,' he wrote, 'I supposed I could write a couple of thousands [sic] words on that trip ... But I spare you.'
> He usually referred to himself in a gently ironic tone, perhaps to avoid giv-

ing an impression of thinking rather too highly of himself. When he arrived in Washington, two troops of local scouts were battling for a prized scouting trophy, the Washington Post Cup. Troop 100, he noted, belonged to the YMCA 'and would therefore probably lose', so he joined the other outfit, Troop 10, 'which must have sighed loudly when it perceived me crossing the threshold'.

The journal also contained flashes of humour, delivered deadpan: 'Visualize me in a natty scout suit, my red hair tumbling out from under my hat, doing my good turn daily. Once I saved a man's life. I could have pushed him under a streetcar but I didn't.' (Nos. 71–73, *BFM* 24.)

[H]e was chosen to represent [the Washington Boy Scouts] on a delegation to the White House to ask President Calvin Coolidge to accept the honorary chairmanship of National Boys' Week. He noted the invitation in his journal with characteristic cheek: 'One fine day the Scout executive telephoned my house and told me I was to meet the president that afternoon. I told him I thought it pretty swell of the president to come way out to my house ...' (No. 74, *BFM* 24.)

The diaries contain Hubbard's first indications of ambition to become a writer. "[H]e began filling his journal with one paragraph synopses of short stories. ..." (*BFM*, p. 43.) Miller notes that, although barely 18 years old, Hubbard "gave the impression that he had been grinding away at a typewriter for years, ending one synopsis ... with a nonchalant addendum that it would include the 'usual plot complications.'" (No. 134, *BFM* 43.)

Another passage, No. 140, six lines long, quoted above in Section 3 illustrates Hubbard's inclination to present himself as "a well travelled man of the world, [and] adventurer." (*BFM* 44.)

---

ty of control phases while waiting to pick up another body, sometimes in competition with other disembodied thetans. Hubbard revealed that most implant stations were on Mars, although women occasionally had to report elsewhere in the solar system and there was a

'Martian implant station somewhere in the Pyrenees'. (No. 43 in part, *BFM* 205–06.)

**10.** See also portions of letter No. 161–174 for illustrations of paranoid derangement.

**11.** *See supra* note 5.

### 11. Accurate Rendition of Idea

■ Several passages, primarily taken from Hubbard's major published writings such as *Dianetics* and *The History of Man*, carry a strong justification for quoting modestly for the purpose of making *accurate* rendition of an idea commented upon in the critical work. (*See* Nos. 20–21, 23–24, 25–26, 32, 33, 34, 35, 37, 41.) I noted in Section 9 above a fair use purpose of illustrating the bizarre quality of some of Hubbard's ideas and pseudo-science. Where a biographer or critic seeks to pass judgment on his subject's ideas, it behooves her to set forth those ideas accurately. If she takes the liberty of restating or paraphrasing the idea in order to avoid copyright infringement, she may be charged with having bent the subject's ideas to make them vulnerable to the criticisms (or simply with having distorted them). In order for the reader to be able to evaluate fairly the merits of the criticism, the reader must receive an accurate presentation of the ideas being criticized and often this requires either quotation or a close, faithful paraphrase. *See Consumers Union of the United States v. General Signal Corp.*, 724 F.2d at 1049–50 ("Where an evaluation or description is being made, copying the exact words may be the only valid way precisely to report the evaluation").

*Bare-Faced Messiah* seeks to *convince* the reader of the bizarre quality of Hubbard's ideas. This cannot be done fairly without setting forth accurately the ideas which merit such criticism. The critic is not limited to telling the readers, "Trust me; those ideas are bizarre," nor required to employ a loose, distant paraphrase which risks distortion. Fair use authorizes a reasonable degree of quotation or close paraphrase for the purpose of accurately stating an idea being criticized.

### 12. Early Writing Style

■ Miller uses several short passages to convey a capsule characterization of the style of Hubbard's earliest fiction writing.

These are taken from the diaries. "None of these efforts," Miller notes, "were startlingly original." For example:

Love story. Goes to France. Meets swell broad in Marseilles. She takes him to her sink, bedroom and bath where he lives until notable citoyens object. He stands them off and takes the next boat for America having received a long expected will donation. (No. 136, *BFM* 43.)

One passage conveys Hubbard's unsophisticated romantic adventure style as well as his awkward lack of ease in approaching the subject of sex:

She took the chair with a sly glance at the boy and folded her slim brown hands in her lap. The Corpsman was suddenly aware that she was beautiful. He swam for a moment in the depths of her clear brown eyes and then seated himself quickly upon the grass. He was somewhat startled by his discovery and told himself fiercely that she was native, native, native. (No. 141, *BFM* 44–45.)

'Dimly he saw Marie on the porch and in a moment he felt her in his arms....' (No. 142, *BFM* 45).

Other passages are also quoted to show young Hubbard's poor command of spelling and grammar, and his melodramatic style:

A lazy sun peeped over the horizon to throw glittering streamers of light across the breakers on the surf. The laggoon ... lay blue and cool. Tropical birds winged about their daily business and two figures lay stretched on the white coral sand. Two ragged figures, several feet apart ... (No. 137, *BFM* 43.)

The girl roused the boy in traditional fashion ('Bob! Bob! Speak to me!'), whereupon Bob spoke thus: ' "Their ... gone, all gone, they're dead and the ship is at the bottom." ' (No. 138, *BFM* 43.)

One passage illustrates that "Like all writers, there were some days when it just would not come right":

'The sun was hot, the day was still, the palm trees gaudy green, lined the beach of that tropical isle ...

'The sun was hot, the day was still and Hospital Corpsman James Thorpe surveyed his tiny domain ...

'The sun was hot, the day was still ...

'The sun was hot and except for the monotonous drone of the sea beating the cruel reef the day was still ...' (No. 139, *BFM* 44.)

Such takings (Nos. 135–142) are for a proper critical fair use purpose. They are the kind of brief excerpt which one reads in any book review to illustrate the reviewer's comments on the style of the author. The Supreme Court in *Nation*, 105 S.Ct. at 2225, quoted Justice Story, sitting as a Circuit Justice in *Folsom v. Marsh*, 9 F.Cas. 342, 344–45 (No. 4,901) (CC Mass. 1841), to the effect that "a reviewer may fairly cite largely from the original work, if his design be really and truly to use the passages for the purposes of fair and reasonable criticism." Story added that when the work is cited not to criticize, "but to supersede the use of the original work," *Folsom v. Marsh*, 9 F.Cas. at 344–45 (*quoted in Nation*, 105 S.Ct. at 2225), the fair use defense is not available. The few instances in which Miller has quoted Hubbard's writing do not supersede the original work. They illustrate a critical commentary by a brief excerpt.

*Fair Use Purpose Less Convincing*

 There are a number of quotations, nearly all from the *Asia Diaries* as to which I find that the fair use purpose is far less convincing. Some of these are extremely brief and insignificant, among them No. 96 (*BFM* 31): a "gosh-awful trip"; No. 97 (*BFM* 31): "we were sure glad to see him"; No. 99 (*BFM* 33): He "felt rather lonely"; No. 102 (*BFM* 33) (of the stars): "Never in my life have I seen such beauties"; No. 109 (*BFM* 38): "faint from lack of sleep and food"; No. 121 (*BFM* 42): "rubberneck stations."

Some of the passages are more substantial. Miller quotes twelve lines of description of the Shanghai markets:

Opening down the main avenue over which our car travelled were hundreds of narrow intriguing streets, teeming with life. Great fish floated here and there and paper banners hung overhead. The stores were stocked with every sort of junk. Dried fish rattled on strings in the wind. Queer looking foods and drygoods

were side by side. Sikh policemen were everywhere. They are big dark bearded fellows and in their turbans and short trousers of khaki look picturesque. They carry great rattan sticks and a rifle across the back. Tommy Atkins was very much in evidence and the American marines, as well as Japanese and British marines. On the outside of the British concession I saw a British tommy take a Chinaman by the coat and knock him across the street. (Nos. 86–88, *BFM* 30.)

Later he quotes nine lines in which Hubbard described his climb to the crow's nest of the naval vessel.

Then I tackled the first fifty feet of ladder. It surely looked and felt insubstantial. About half way up I thought I'd never been so nervous before. After that ladder came an even smaller steel ladder. Up I went all confidence by this time. In a moment I reached the nest and sure enough there was the lookout reading a "Western Story". He invited me to climb in. The last in itself is worse than the rest of it put together. One has to dangle with nothing under him and work half way round to the other edge. Over the side of the box I swung and then in. My god what a relief! (No. 105, *BFM* 34.)

There is also an 11 line description of an ancient ruined fort in Guam (No. 98, *BFM* 32–33). The last five lines are perhaps a fair use comment on Hubbard's pompously melodramatic sentimentalism. But there is little apparent fair use justification for the first half of the description.

Similarly, Miller quotes nine lines in which Hubbard recorded his surprise on seeing camels in China.

"I believe that the most startling thing one can see in Northern China", he wrote, "is the number of camels. These are of a very mean breed but they resist cold and carry burdens which is all the Chinaman requires of them. Every day in Peking one can see many caravans in the streets. They have a very stately shamble. They carry their head high; their mean mouths wagging and their humps lolling from side to side. All my

life I have associated camels with Arabs and it strikes a discordant note with me to see the beasts shepherded by Chinamen." (Nos. 131–32, *BFM* 42–43.)

In addition, I found no compelling fair use justification for certain insignificant excerpts from a letter written by Hubbard to his wife Polly in 1939. (Nos. 143–148, *BFM* 81.) Other parts of the letter, mentioned above, in which Hubbard speaks of his hope of "smashing [his] name into history so violently that it will take legendary form," carry a very compelling fair use purpose. Much of the quotation from the letter concerns description of its ideas without infringement of the protected expression. About 30 words (contained in nos. 143 (1 word), 144, 147 (5 words) and 148) are technically infringing, but these are so insignificant that they are scarcely worth noting.

\* \* \*

 In conclusion as to the first statutory factor, I find that *Bare–Faced Messiah* is a work exhibiting a strong, critical, educational fair use purpose and that the great majority, but not all, of its quotations of protected expression are for a powerfully compelling fair use purpose that could not properly be accomplished without use of the subject's own words. On the other hand, in a few instances of quotation of unpublished material, I find much less compelling fair use justification. These passages undoubtedly play a role in filling out the biographer's portrait of his subject. They may, however, fall short of demonstrating a sufficiently powerful claim of a fair use purpose to satisfy the test of "narrower" scope for unpublished material.

### C. *Amount and Substantiality of Portion Used*

 The third statutory factor looks to the "amount and substantiality of the portion used in relation to the copyrighted work as a whole." "Amount" and "sub-

stantiality" have different emphases. "Amount" cautions that the fair user should not take too large a percentage of the copyrighted work. "Substantiality" looks rather to how important a part, rather than how large a part, was taken.[12] *See Roy Export Co. v. Columbia Broadcasting System,* 503 F.Supp. 1137, 1145 (S.D.N.Y.1980), *aff'd,* 672 F.2d 1095 (2d Cir.), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed. 2d 63 (1982). The significance of the "amount and substantiality" factor is largely subsumed in the fourth factor—effect on the market. *See* Fisher, *Reconstructing The Fair Use Doctrine,* 101 Harv.L.Rev. 1661, 1678 (1988).

This factor is somewhat inconclusive. As to the takings from published works, it strongly favors the defendant. Many of Hubbard's books are hundreds of pages long.[13] Those from which extracts are taken aggregate over 1½ million words, of which *Bare–Faced Messiah* takes less than 2,000 (Gready Aff. ¶ 2) consisting of scattered, illustrative phrases, sentences and occasionally paragraphs.

 As to the unpublished works, the picture is mixed, and depends on what is considered the "copyrighted work as a whole." If the passages taken are compared to the body of unpublished Hubbard letters, memos and journals, it appears the takings represent an insignificant fragment. Hubbard's executor evasively estimated the volume of this body of work between 5,000–75,000 pages. (Gready Aff. ¶ 3 Exh. A, p. 125.) It is impossible for the court to judge its volume because plaintiff has refused to produce it for inspection. Drawing a warranted inference against the plaintiff for its refusal to produce evidence within its control, I conclude that a relatively insubstantial portion of the overall bulk is taken. In some instances, however, a taking from a letter involves the major part *of that letter.* Considering separately the *Asia Diaries* which Hubbard kept during

---

**12.** Thus in *Nation,* a taking of a very small but important percentage of the protected work ran afoul of this standard. *Nation,* 105 S.Ct. at 2233.

**13.** The entire corpus of Hubbard's published work is even larger. Plaintiff has filed submissions to the effect that Hubbard produced nearly 600 fiction and non-fiction works. Heldt Aff. ¶ 2.

his teenage voyages, the takings are more than negligible.

■■■■ I am mindful of the Supreme Court's quotation from the Senate Report that " 'Isolated instance of minor infringements, when multiplied many times, become in the aggregate a major inroad on copyright that must be prevented.' " *Nation*, 105 S.Ct. at 2235 (quoting S.Rep. No. 94–473, at 65). The issue does not lend itself easily to generalizations as different configurations of takings will yield very different analyses. Where the aggregation of many minor takings in fact produces a "major inroad" that effectively supersedes the original and adversely affects the potential market for the copyrighted work, that is a powerful factor tending to negate fair use. Where, on the other hand, the aggregate of separate instances of fair use takings do not impair the potential market, this factor will not tend to negate fair use.

I note in passing that the numbers plaintiff uses to argue this issue are not reliable, either as to the instances of infringement or the word count. Plaintiff's count of 201 instances of infringement results from the use of a series of numbers to identify successive passages taken from the same document. In some cases the subdivision is arbitrary, perhaps designed to produce an impressive allegation. For example, in one letter a separate number is given to the quotation of the letterhead "L. Ron Hubbard, D.D., Ph.D." (No. 187), while three more numbers are assigned to passages from the body of the letter. (Nos. 188–90.) In one case, fourteen numbers are assigned to excerpts from one letter (Nos. 161–74).

■■■ Some of plaintiff's word counts are also substantially exaggerated. The copyright protects only the author's particular expression and not the facts (or ideas) communicated by his writing. *See Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 978 (2d Cir.), *cert. denied*, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980); *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303 (2d Cir.1966), *cert. denied*, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967). In many of the passages cited by plaintiff as infringing, plaintiff includes (and counts) not only the quote (or close paraphrase) of Hubbard's expression but also the surrounding material which reports facts in Miller's own words. In many of the passages cited by plaintiff, only a small portion involves a quote or close paraphrase of protected expression. In several of these, plaintiff cites a 30–60 word passage as infringing, whereas in fact only 6 or 8 words involve a taking of protected expression.

For example:

| BFM | Hubbard |
|---|---|
| 78. First stop, six days out, was Honolulu, where the President Madison was greeted in the harbour by flotillas of small boats rowed by lithe, brown-skinned urchins who dived for quarters flipped overboard from the deck of the steamship. They used to dive for pennies, Ron noted laconically, 'thus has the Hawaiian developed his commerce'. | Six days later at dawn we hurried on deck to view Hawaii. Coming into the harbor at Honolulu, all the beach boys swam out to the ship to dive for quarters. It used to be pennies. Thus the Hawaiian developed his commerce. |
| 93. There was considerable confusion unloading the baggage from the President Madison, which Ron blamed on the 'lazy, ignorant natives', and it was some time before their trunks were safely on their way and May and Ron could relax with a glass of lemon squeeze at the Manila Hotel. | After a hard docking against tide and wind, we found ourselves confronted with a baggage problem. A lot of lazy, ignorant natives gathered our grips. We hopped into a carrameta and went to the Manila Hotel where Mother and I indulged in a glass of "lemon squeeze". |

In a few instances, no doubt by mistake, the table cites the same material twice (Nos. 8, 10, 11), and quotes sentences which simply do not appear in defendant's book. (Nos. 13, 14.) (By letter plaintiff's counsel has withdrawn allegations of infringement as to these passages (*see* letter of May 10, 1988.))

I attach little importance to plaintiff's overcounting other than to point out that its numbers are unreliable. Even after correcting such overcounts, there remains a substantial amount of taking of protected expression sufficient to raise a serious problem of copyright infringement if the takings are not protected by fair use.

### D. *Effect on the Market*

■ The fourth statutory factor looks to the effect of the claimed fair use on the "potential market price or value of the copyrighted work." The Supreme Court designated this as "undoubtedly the single most important element of fair use." *Nation*, 105 S.Ct. at 2234; *see Triangle Publications, Inc. v. Knight–Ridder Newspapers, Inc.*, 626 F.2d 1171, 1177 (5th Cir. 1980). The Court cites Nimmer to the effect that fair use is limited to copying " 'which does not materially impair the marketability of the work which is copied.' " *Id.* (quoting 1 M. Nimmer, *Nimmer on Copyright*, § 1.10[D], at 1–87 (1984)). The Court had no difficulty affirming District Judge Owen's finding that the *Nation*'s taking of the "heart" of the presidential memoirs had caused *Time Magazine* to cancel its serialization. These observations focus attention on the essentially commercial nature of the copyright interest. The fair use statute thus recognizes the public interest in criticism, news reporting, research, teaching, etc., and the importance to these undertakings of quotation from copyrighted material, but specifies that such quotation must not impair the author's right to realize the profits of his endeavors.

As to this factor, I credit plaintiff's assertion that it will commission an authorized biography of Hubbard and that the entire archive of Hubbard's writings, including the documents quoted by Miller, will be available for this project. A part of plaintiff's contention is that the market for the licensing of Hubbard's copyrights for use in such a biography is impaired by *Bare–Faced Messiah*.

■ In assessing this factor, we must distinguish between different causes of effect on the market for the copyrighted work. The statute seeks to protect only against causes that are within the protection of the copyright law. One significant distinction is between adverse market effect that is caused by adverse criticism and the effect caused by providing the copyrighted author's work to the readers within the covers of the secondary user's book. The cause with which the statute concerns itself is the latter—a taking which sufficiently offers the author's work in a secondary packaging that potential customers, having read the secondary work, will no longer be inclined to purchase again something they have already read. *See Consumers Union of the United States, Inc. v. General Signal Corp.*, 724 F.2d 1044, 1051 (2d Cir.1983), *cert. denied*, 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984); *Triangle Publications, Inc. v. Knight–Ridder Newspapers, Inc.*, 626 F.2d 1171, 1177–78 (5th Cir.1980); W. Patry, *The Fair Use Privilege in Copyright Law* 403–04 (1985).

Nor does the statute concern itself with effect on the market caused by secondary communication to the public of *facts* which are not within the copyright protection. Thus an autobiography and an independent biography of the same subject compete with one another for that portion of the public's time and money which it is willing to spend on books about that subject. The statute does not concern itself with market effect resulting from the competition to apprise the public of an area of factual interest. *See Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 978 (2d Cir.), *cert. denied*, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980); *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303 (2d Cir.1966), *cert. denied*, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967).

I recognize that *Bare–Faced Messiah* may conceivably have an adverse effect on

the market for Hubbard's work of the type which is *not* within the statute's concern. Miller advances a hostile, derogatory account of Hubbard, suggesting that Hubbard was dishonest, conniving, opportunistic and insane. Readers of *Bare–Faced Messiah* who credit this critique may lose interest in purchasing Hubbard's own writings or an authorized Hubbard biography. That is unquestionably an "effect on the market for the copyrighted work," but it is not the kind of effect that the statute contemplates. If it were, fair use would be accorded only to favorable critics.

Similarly, there may be purchasers who are sufficiently interested in Hubbard to purchase one book about him, but not two. *Bare–Faced Messiah* may have an adverse impact on the marketability of Hubbard's writings with those purchasers simply by exhausting their interest. That is not within the concern of the copyright statute.

■ I do not believe, however, that *Bare–Faced Messiah*'s use of Hubbard's expressions will have any effect (of the type contemplated) on the market for Hubbard's writings. Although it is true that substantial portions are taken from particular letters, the takings do not communicate the aggregate expression of any body of Hubbard's written work. What they do is communicate critical points made by Miller about Hubbard. Although the takings are numerous, and in the aggregate, substantial, they are drawn from a wide variety of sources, and constitute only small fragments of the aggregate of these sources.

I do not accept the defendant's argument that the potential customers for Hubbard's writings are divided into two groups—those who are for and those who are against Hubbard. Defendant postulates that Hubbard's supporters would not be dissuaded from buying his works by anything they read in *Bare–Faced Messiah* and that his detractors would not be potential customers in any event. I believe this view over-simplifies. Many potential customers who are interested in Hubbard may not know whether they should admire or abhor him. *Bare–Faced Messiah* may influence potential customers in different

ways. On the other hand, it will be clear to any reader of *Bare–Faced Messiah* that she had not literally read Hubbard's writings. What she has read is a hostile, critical biography using fragmentary extracts to demonstrate critical conclusions about him. One who has an interest in reading Hubbard's writings would have no sense of having satisfied that interest by reading *Bare–Faced Messiah.*

I find, therefore, that readers would not be dissuaded from purchasing Hubbard's work by Miller's extracts. Miller's use of Hubbard's writings will not affect the market for Hubbard's copyrights. This factor favors the defendant.

*Conclusion as to Fair Use*

My conclusion on Holt's claim of fair use is complex.

As to the published materials (Nos. 1–69), there is no difficulty whatsoever. The fair use factors powerfully favor the defendant. The purposes supporting quotation of the particular passages convincingly support a finding of fair use. The effect on plaintiff's market is practically non-existent. The only aspect of a statutory factor that favors plaintiff is that Holt's book is sold for commercial profit. That is of small importance.

As to the unpublished material, the conclusion is less simple. The fact that these matters remain unpublished tends to negate fair use. Although this fact does not bar a finding of fair use, it argues against it. In order to overcome this factor, the defendant must establish a highly convincing case in favor of fair use.

As to the great majority of items, I find that defendant has done so. Most of these items are justified by a powerfully compelling fair use purpose—a purpose which reasonably requires use of the author's particular words to demonstrate the validity of an important critical point. These are not instances like those cited by the Court of Appeals in *Salinger* and by this court in *Craft v. Kobler,* 667 F.Supp. 120 (S.D.N.Y. 1987), where the biographer has used the lively expression of his subject to enliven the biography. These are uses for which

the biographer's point cannot be effectively demonstrated without using the subject's words—demonstrations of traits of character. Personal qualities of this nature often cannot be shown except by use of the subject's words. It makes no sense in such cases to speak of limiting the biographer to reporting the facts contained in the subject's letters without taking his protected expression. The letters are not being used as a source of facts reported in them, The important facts in such instances are the words themselves. Their value for the biography lies precisely in the subject's choice of words—not as a matter of literary expression—but for what the choice of words reveals about the subject. Thus, as to Hubbard's sentence, "The trouble with China is, there are too many Chinks here," (No. 133, *BFM* 43), there is no fact reported in it which the biographer has an interest in narrating. What is interesting is that Hubbard said it.

Nor should a biographer/critic be limited to stating her conclusions about the subject's choice of words. It would be preposterous to restrict Miller to writing something like, "Hubbard used a vulgar derogatory epithet exhibiting snobbish bigoted disdain for the Chinese." That would be at once unfair to the biographer, the subject, and the readership, which can reasonably demand to know "What did he say? Let us be the judge of whether it was vulgar, snobbish or bigoted."

Whether the negative influence of the fact of non-publication will defeat the claim of fair use depends on whether the secondary user can show a sufficiently powerful fair use claim based on all relevant factors to defeat the normal rule favoring protection. As to a very large number of Miller's quotation, I find that he succeeds in doing so.

■ As to the book overall, were it not for the ruling of the Court of Appeals in *Salinger*, I would conclude that fair use had been adequately demonstrated. That was the conclusion I reached as to the Salinger biography. *Salinger v. Random House, Inc.*, 650 F.Supp. 413 (S.D.N.Y. 1986), *rev'd*, 811 F.2d 90 (2d Cir.1987).

Here the demonstration of fair use is far more compelling. Many of the takings of Salinger's expression were for the purpose of enlivening that text with Salinger's expressive genius. That is not the case here. Hubbard's expression is taken primarily to show character flaws in a manner that cannot be accomplished without use of his words.

Nonetheless, given *Salinger's* strong presumption against a finding of fair use for unpublished materials, I cannot conclude that the Court of Appeals would accord fair use protection to all of Miller's quotations, or that the biography as a whole would be considered non-infringing.

I listed above approximately 44 passages as to which a fair use purpose is not convincingly shown. Although some of these are very brief and inconsequential, amounting to no more than a few words, others involve rather lengthy descriptions.

Also, given the force of the presumption expressed by the *Salinger* court against a finding of fair use for unpublished materials, I have some doubt whether that court would sanction the use of multiple examples to portray a particular quality. For example, *Bare–Faced Messiah* uses numerous instances of Hubbard's expression to illustrate his boastfulness, pomposity, pretension and self-important grandiosity. In my view this variety is appropriate. The examples do not duplicate one another; they combine to reveal a complex picture of complex qualities displayed by Hubbard at different times of his life. But the *Salinger* court might find that Miller's examples were too numerous—that the fair use interest diminishes with the quotation of sufficient examples to make the point. Also some of the instances are less effective and important than others as demonstrations of the characteristics in question. These also might well be disallowed as fair uses.

I conclude that there is a body of material of small, but more than negligible size, which, given the strong presumption against fair use of unpublished material, cannot be held to pass the fair use test. I therefore find, under mandate of the *Salinger* opinion, that *Bare–Faced Messiah* to

some degree infringes Hubbard's copyrights in some of his previously unpublished works.

## II. Should Publication Be Enjoined?

Injunctions are generally issued to prevent infringement of copyright. Although it is standard doctrine that injunction is a drastic remedy that should not issue except on a finding of irreparable injury which damages will not adequately compensate, *see Weinberger v. Romero–Barcelo,* 456 U.S. 305, 311–12, 102 S.Ct. 1798, 1802–03, 72 L.Ed.2d 91 (1982); *City of Harrisonville v. Dickey Clay Mfg. Co.,* 289 U.S. 334, 337–38, 53 S.Ct. 602, 603–04, 77 L.Ed. 1208 (1933), it has become commonplace in copyright cases to assume such injury. *See e.g., Hasbro Bradley, Inc. v. Sparkle Toys, Inc.,* 780 F.2d 189, 192 (2d Cir.1985); *Wainwright Securities, Inc. v. Wall Street Transcript Corp.,* 558 F.2d 91, 94 (2d Cir.1977), *cert. denied,* 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978); *Rushton v. Vitale,* 218 F.2d 434 (2d Cir.1955). An injunction is easily justified in many common types of copyright infringement. Infringement often involves piracy of artistic creations motivated exclusively by greed. Unscrupulous opportunists flood the marketplace with copies of best-selling dress fabrics, popular children's toys, or successful films on VCR tapes. Because they incur no development cost, no risk and no advertising expense, they sell profitably at a fraction of the price of the authentic merchandise and thus destroy the creator's market. Such instances of infringement serve no useful purpose. Worse, they destroy the rewards and incentives for artistic creation. The harm to the copyright owner is difficult to assess, in part because these infringers carry on their activities in secret. In short, all relevant considerations support enjoining such activity.

The issue presented here is drastically different. First, the character of the infringing conduct has nothing in common with such opportunistic free riding. Hubbard's writing is quoted to substantiate the argument of a laboriously researched, well-constructed biography representing, right or wrong in its views, a valuable commentary on a subject of public importance. The portions as to which I find no compelling fair use justification are insignificant. This is not profiteering by appropriating the creative effort and genius of another. It is providing, by research, investigation, study, analysis and creative writing, a valuable, if debatable, study.

The grant of an injunction would diminish public knowledge. It would suppress an interesting, well-researched, provocative study of a figure who, claiming both scientific and religious credentials, has wielded enormous influence over millions of people. Surely the suppression of such a work implicates concerns of the First Amendment. The abhorrence of the First Amendment to prior restraint is so powerful a force in shaping so many areas of our law, it would be anomalous to presume casually its appropriateness for all cases of copyright infringement. In contrast, we accept as black letter that an injunction is not available to suppress defamatory speech. *See Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 557–60, 96 S.Ct. 2791, 2801–03, 49 L.Ed.2d 683 (1976); *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); *In the Matter of the Providence Journal Co.,* 820 F.2d 1342, 1350 (1st Cir.1986), *modif.,* 820 F.2d 1354 (1st Cir.1987), *cert. dismissed,* —— U.S. ——, 108 S.Ct. 1502, 99 L.Ed.2d 785 (1988); *see also Galella v. Onassis,* 487 F.2d 986 (2d Cir.1973) (modifying injunction to permit news coverage).

In the past, efforts to suppress critical biography through the copyright injunction have generally not succeeded because courts (sometimes straining) have found fair use. *See Rosemont Enterprises, Inc. v. Random House, Inc.,* 366 F.2d 303 (2d Cir.1966), *cert. denied,* 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967); *Meeropol v. Nizer,* 361 F.Supp. 1063 (S.D.N.Y. 1973), *remanded for further findings,* 560 F.2d 1061 (2d Cir.1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978); *Estate of Hemingway v. Random House, Inc.,* 49 Misc.2d 726, 268 N.Y.S.2d 531 (Sup. Ct.N.Y.Co. 1966), *aff'd,* 25 A.D.2d 719, 269

N.Y.S.2d 366 (1st Dept.1966), *aff'd on other grounds*, 23 N.Y.2d 341, 296 N.Y.S.2d 771, 244 N.E.2d 250 (1968). The conflict between freedom of speech and the injunctive remedy was thus avoided. Since *Salinger*, however, the issue is inescapable. If a biographer, historian or critic needs to use unpublished letters to make her critical points, she cannot confidently rely on the doctrine of fair use, no matter how worthwhile, creditable and instructive the biography may be. We must, therefore, focus with new intensity on the potential conflict between the copyright and freedom of speech, and particularly on the question whether a finding of infringement should ritualistically call forth an injunction. *See* Abrams, *First Amendment and Copyright*, 35 Journal of the Copyright Society 1, 11 (1987); Goldstein, *Copyright and the First Amendment*, 70 Colum.L.Rev. 983, 1030 (1970).

A finding of fair use has consequences going far beyond denial of an injunction. It means also that the author receives no compensation for commercial use of his copyrighted authorship. It is important to recognize that the justification of the copyright law is the protection of the *commercial* interest of the artist/author. It is not to coddle artistic vanity or to protect secrecy, but to stimulate creation by protecting its rewards. The copyright seeks to ensure that authors will not be deprived of the fruits of their labors and will be encouraged to employ their creative talents by confidence that the rewards will not be taken from them. *See Nation*, 105 S.Ct. at 2229. There may thus be instances where solicitude for the author's commercial entitlements, especially in first publication, will motivate a court to protect his compensation right by denying a finding of fair use, while solicitude for a free press and free public discussion will require denial of an injunction. If, on the particular facts, the copyright owner can be reasonably compensated in damages for injury to this commercial interest, and the injury to the public interest in free speech resulting from injunction would be great, that is a powerful reason for limiting the remedy to damages and withholding the injunctive relief.

The Copyright Act, on its face, does not require a grant of injunctive relief. It states in permissive terms that the court "may ... grant ... final injunctions." 17 U.S.C. § 502. The copyright owner may also recover damages for his losses (including statutory damages) as well as appropriate portions of the infringer's profits. *See Lottie Joplin Thomas Trust v. Crown Publishers*, 592 F.2d 651, 657 (2d Cir.1978); *see also Sygma Photo News, Inc. v. High Society Magazine, Inc.*, 778 F.2d 89, 95 (2d Cir.1985) (court should err on side of granting plaintiff a full recovery). Prior to the 1909 Copyright Act courts often denied injunctive relief and limited the plaintiff to a recovery of damages where most of the defendant's work consisted of noninfringing material. *See Dun v. Lumbermen's Credit Ass'n*, 209 U.S. 20, 28 S.Ct. 335, 52 L.Ed. 663 (1908). Four Justices of the Supreme Court have recently suggested granting other than injunctive relief in appropriate circumstances. *See Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 499–500, 104 S.Ct. 774, 817–818, 78 L.Ed.2d 574 (1984) (Blackmun, J., dissenting).

Neither the Supreme Court in *Nation* nor the Court of Appeals in *Salinger* contemplated the question whether an injunction need inevitably follow from a finding of infringement. The *Nation* suit was brought after the fact of the infringing publication. No injunction was sought. The Court therefore considered only *The Nation*'s liability for damages for infringement. *Salinger* was decided on a motion for *preliminary* injunction. The only issue debated was whether fair use had been established. *See Salinger*, 811 F.2d at 92. ("This appeal presents the issue whether the biographer of a renowned author has made 'fair use' of his subject's unpublished letters.") The decision does not discuss whether a *permanent* injunction should necessarily follow if the defendant fails to establish fair use.

I recognize that in *Nation* the Supreme Court devoted considerable attention to the

author's right "to refrain from speaking at all," 105 S.Ct. at 2230 (quoting *Estate of Hemingway, supra,* 23 N.Y.2d at 348, 296 N.Y.S.2d 771, 244 N.E.2d 250) a right which arguably cannot be preserved without an injunctive remedy. I believe, however, that a proper understanding of this right involves subtle differences which do not favor plaintiff here. The Court's discussion of the copyright owner's "deliberate choice" not-to-publish used as an example (drawn from the Senate report) the unauthorized classroom distribution of photocopies of an unpublished scholarly article. The Senate Report and the Court concluded that the author's "right to decide whether and when to publish would under ordinary circumstances ... outweigh any needs of reproduction for classroom purposes." *Id.,* 105 S.Ct. at 2227. On the other hand, the Court asserts firmly, "we do not suggest this right not to speak would sanction abuse of the copyright owner's monopoly as an instrument to suppress facts." *Id.* at 2230.

The distinction between a proper and an abusive exercise of that freedom bears on this controversy. It is one thing to exercise the right to prevent premature publication of a novel or scholarly article which the author may wish to further perfect. That factor has no application here. The proper concern of the Supreme Court might also arise where an author chooses to discard rather than publish a work, either because he considers it substandard or for any other reason. On appropriate facts that concern might influence the assessment of a fair use defense or the availability of an injunction. It cannot, however, be invoked to command an automatic injunction, barring selected quotation which reveals relevant and important facts of public interest about the character of the author. Hubbard's followers might well wish to prevent public dissemination of some of Hubbard's utterances. These utterances are, however, pertinent historical facts. Regardless whether we conclude under a

"fair use" analysis that the copyright holder should not lose his right *to receive compensation* from the public dissemination of such writing, it does not necessarily follow that the author or his heirs or licensees should possess the power to prevent the public from learning informative facts inherent in his declarations.

Nor is this a proper case for application of a different line of Supreme Court authority recognizing a right not to speak. *See Pacific Gas & Electric Co. v. Public Utilities Commission of California,* 475 U.S. 1, 16, 106 S.Ct. 903, 911, 89 L.Ed.2d 1 (1986); *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977); *West Virginia Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). This right concerns the question whether one may be required to announce or transmit a message one had no part in creating and may indeed disagree with. It has been asserted by citizens of a state protesting the obligation to display a message on the license plates of their cars and by utility companies protesting a requirement that they disseminate in their billing envelopes messages propounded by others.

That principle has no application to this case. These are not the words of others thrust upon Hubbard. They are his words. He had the right not to speak but chose not to exercise it. The question is whether the copyright licensee is entitled to an injunction that would prevent the public from learning interesting pertinent newsworthy facts of Hubbard's utterances.

▆▆▆ When the interests protected by the copyright are in acute conflict with those represented by the First Amendment, courts should weigh cautiously whether a prior restraint in the form of an injunction is the appropriate remedy. An award of damages or profits designed to secure for copyright owners appropriate rewards of creativity can protect the copyright holder with far less injury to the public interest in freedom of speech than an injunction.[14]

---

14. A further question arises: In determining questions of fair use and of remedy, should a court consider whether a copyright action is brought in good faith to preserve the benefits

secured by the copyright law or whether it is brought to accomplish a different purpose, such as combatting a hostile or derogatory publication. *See Rosemont Enterprises, Inc. v. Random*

Thus Professor Nimmer, although recognizing the existence of authority requiring an injunction, cautioned that "where great public injury would be worked by an injunction, the courts might follow cases in other areas of property law and award damages as a continuing royalty instead of an injunction under such special circumstances." 3 M. Nimmer, *Nimmer on Copyright*, § 14.06[B] at 14–56.1 (1987); *see also* Fisher, *Reconstructing the Fair Use Doctrine*, 101 Harv.L.Rev. 1659, 1726 (1988) (advocating increased use of licenses); Nimmer, *Copyright Liability for Audio Home Recording*, 68 Va.L.Rev. 1505, 1530–32 (1982).

I have no difficulty concluding that this is one of those special circumstances in which the interests of free speech overwhelmingly exceed the plaintiff's interest in an injunction. As a practical matter, an injunction would kill this informative book. As the book is already in print, the expense and waste involved in republishing after deleting infringing material would be prohibitive. The injury to freedom of speech would be significant. The public would be deprived of an interesting and valuable historical study. No significant copyright interest would be served by an injunction. I conclude, notwithstanding some small degree of infringement, that a permanent injunction should be denied.

SO ORDERED.

*House, Inc.,* 366 F.2d 303, 311 (2d Cir.1966) (Lumbard, J., concurring); *see also Meeropol v. Nizer,* 560 F.2d 1061, 1069 (2d Cir.1977) (distinguishing *Rosemont* as a case in which plaintiff tried to prevent publication of a biography). The record contains substantial indication that plaintiff's primary interest is to destroy a book that is hostile to the Hubbard image. Hubbard's executor testified to the effect that he would never license the Hubbard copyrights for use in a book that was critical of Hubbard. (Gready Aff.Exh. A at p. 105.) The author, Miller, reported in his book that his way was obstructed at every turn by the Church of Scientology. As early as May 1986 attorneys for the Church were writing to the publisher Holt suggesting that Miller's book would be defamatory and threatening litigation. The question at least arises whether this lawsuit is brought to protect the commercial interest—Hubbard's copyrights —or whether it is an implementation of Hubbard's advice, quoted in *Bare-Faced Messiah,* that "the law can be used very easily to harass ... If possible, of course, ruin [the adversary] utterly." (No. 47, *BFM* 223.) I do not rely on these considerations in reaching my conclusion.